Brown vs. Phillips and others.

Brown, Respondent, vs. Phillips and others, Appellants.

*January 13 — January 31, 1888.*

*(1-3) Constitutional law: Woman suffrage: Elections pertaining to school matters. (4) Pleading: Conclusions of law: Demurrer.*

1. Under sec. 1, art. III, Const., the legislature may, by law approved by the people as therein prescribed, extend the right of suffrage to women.
2. An "election pertaining to school matters," within the meaning of ch. 211, Laws of 1885 (which gives to women the right to vote at such elections), is an election for the choosing of school officers or school employees. The mere fact that a city, county, or state officer, as incident to his office, is required to do some act which may affect schools (as where a mayor appoints school commissioners), does not make the election of such officer one pertaining to school matters.
3. *It would seem* that where school officers and other officers are required to be voted for upon the same ballot, the inspectors of election are not authorized to receive the votes of women even for such school officers.
4. In an action against inspectors of election for refusing to receive the vote of a woman, allegations of the complaint that the plaintiff " was a legally qualified elector . . . and was entitled to vote at such election," are held to be mere conclusions of law and not to be admitted by a demurrer.

APPEAL from the Circuit Court for *Racine* County.

The substance of the complaint is thus stated by Mr. Justice CASSODAY:

The complaint in this action alleges, in effect, that the plaintiff, a woman of lawful age and a citizen of the United States and of Wisconsin, was April 5, 1887, a resident of

the Second ward of the city of Racine, and had so resided continuously for the nine years immediately prior thereto; that on said day the annual municipal election in and for said city was held in the several wards therein, for the election of mayor, city clerk and comptroller, justice of the peace, assessor, city marshal, an alderman for each ward, and a supervisor; that said election was one "pertaining to school matters;" that the defendants were the qualified and acting inspectors of election in and for said ward, constituting one of the election districts in said city, at said municipal election held on that day at the usual polling place in and for said ward; that the plaintiff was on said day a legally qualified elector at said election, and entitled to vote in said ward, and possessed none of the disabilities enumerated or referred to in ch. 211, Laws of 1885; that within the prescribed hours for voting, at said voting place in and for said ward, she did offer publicly to said inspectors, then present, a ballot with the names of candidates thereon for the respective offices of mayor, clerk and comptroller, alderman, and supervisor, and with the names of candidates stricken out thereon for the respective offices of justice of the peace, assessor, and city marshal; that said inspectors, acting as such, did then and there refuse to receive and rejected said ballot, and did then and there neglect and refuse to administer to the plaintiff the oaths and each of them prescribed by secs. 36, 38, R. S.; that she at the same time delivered to said inspectors her affidavit, together with the affidavits of two freeholders of the ward, proving her said residence and excusing her want of registration, and read the same to said inspectors, after which they did still refuse to receive said ballot from the plaintiff or permit her to vote at said election, to her damage $5,000, for which amount she demands judgment.

The defendants appealed from an order overruling a general demurrer to the complaint.

*D. H. Flett,* attorney, and *T. W. Spence,* of counsel, for the appellants, contended: (1) Ch. 211, Laws of 1885, does not confer the right of suffrage upon women except in elections pertaining directly and exclusively to school matters. (2) The legislature has no power under the constitution to confer the right of suffrage upon women. When the constitution prescribes the functions of departments of the government, or of its officers, or territorial limits for governmental subdivisions, or qualifications for the exercise of political rights, there is thereby secured to the public, protection from legislative change, enlargement, or circumscription of such departments, functions, or rights. See *Gough v. Dorsey,* 27 Wis. 131; *Van Slyke v. Trempealeau Co. F. M. F. Ins. Co.* 39 id. 390; *Chandler v. Nash,* 5 Mich. 409; *State ex rel. Crawford v. Hastings,* 10 Wis. 525; *McCabe v. Mazzuchelli,* 13 id. 534; *State ex rel. Kennedy v. Brunst,* 26 id. 412; *State ex rel. Wood v. Goldstucker,* 40 id. 124; *Att'y Gen. v. McDonald,* 3 id. 805; *People ex rel. Bolton v. Albertson,* 55 N. Y. 50; *Page v. Allen,* 58 Pa. St. 338; *Dells v. Kennedy,* 49 Wis. 556; *Minor v. Happersett,* 21 Wall. 163, 170, 172; Cooley on Const. Law, 251; *People v. Draper,* 15 N. Y. 543; Cooley's Const. Lim. (4th ed.), 104. The proviso in subd. 4, sec. 1, art. III, Const., under which the law in question was passed, provides that the legislature may extend, by law, the right of suffrage to persons not therein *enumerated.* The word *enumerate* is defined by Webster as " to number, to tell off, or count by numbers;" and it must refer to the four classes of persons distinctively numbered or told off in subd. 1–4 of the section. The legislature might, in the manner indicated, add to or enlarge those classes, but could not change the indispensable qualifications of sex, age, and residence in the state. This construction of the constitution has just been recognized by the legislature and the people by passing a constitutional amendment by which an express power has been vested,

within certain limits, to fix the necessary time of residence of any voter in his election district. And the history of the proviso and of the whole of art. III, in the constitutional convention, shows that it was intended to limit the power of the legislature within the provisions of the first paragraph of sec. 1. (3) An inspector of election is not liable to an action for damages to a person claiming to be an elector, for refusing to receive his vote in a new and doubtful case, in the absence of proof of malice. *Jenkins v. Waldron,* 11 Johns. 114; *Weckerly v. Geyer,* 11 Serg. & R. 35; *Caulfield v. Bullock,* 18 B. Mon. 495; *Morgan v. Dudley,* id. 693; *Carter v. Harrison,* 5 Blackf. 138; *Gordon v. Farrar,* 2 Doug. 411; *Peavey v. Robbins,* 3 Jones, Law, 339; *Rail v. Potts,* 8 Humph. 225; *Fausler v. Parsons,* 6 W. Va. 486; *State v. M'Donald,* 4 Harr. (Del.), 555; *Dwight v. Rice,* 5 La. Ann. 580; *Bevard v. Hoffman,* 18 Md. 479; *Zeiler v. Chapman,* 54 Mo. 502; *U. S. v. Gillis,* 2 Cranch C. C. 44. The sole reasoning upon which the decision of this question in *Gillespie v. Palmer,* 20 Wis. 557–8, is founded, is inapplicable to the case at bar; and the opinion in that case has been subjected to the animadversion of this court more than once. See *Sawyer v. Dodge Co. Mut. Ins. Co.* 37 Wis. 524; *Bound v. Wis. Cent. R. Co.* 45 id. 579.

For the respondent there was a brief by *Rowlands & Rowland,* and oral argument by· *W. W. Rowlands* and *I. C. Sloan.* They contended, *inter alia,* that ch. 211, Laws of 1885, is a valid act. A state constitution is not a grant but a restriction upon the powers of the legislature; and the national and state constitutions impose the only limitations upon the legislative power. To warrant a court in declaring an act of the legislature void and of no effect, there must be a conflict between said act and these fundamental instruments, and such conflict must be clear and free from reasonable doubt. Sec. 1, art. III, Const. of Wis., therefore confers upon all the persons mentioned therein the right of

suffrage, and this right the legislature cannot take away, abridge, or impair, except for crime. The proviso contained in subd. 4 of sec. 1, does not *confer* upon the legislature power to extend suffrage. That power already exists, and the object of the proviso is merely to *abridge* that power by declaring that no such law shall be in force until the same shall have been submitted to the people, etc.

Inspectors of election are ministerial officers, and malice in the rejecting of ballots by them need not be alleged or proved. *Gillespie v. Palmer*, 20 Wis. 544; *Lombard v. Olliver*, 3 Allen, 1; *Gates v. Neal*, 23 Pick. 308; *Capen v. Foster*, 12 id. 485; *Bacon v. Benchley*, 2 Cush. 100; *Goetcheus v. Matthewson*, 61 N. Y. 420.

The municipal election held in the city of Racine on April 5, 1887, was an election pertaining to school matters, such as was contemplated by ch. 211, Laws of 1885. The commissioners who constitute the board of education in Racine are appointed by the *mayor* and confirmed by the *common council*. All contracts entered into by the board, except the employment of teachers, are required to be countersigned by the *city comptroller*. The legislative functions of the county are exercised by the board of *supervisors*, in which the city is represented. For these officers the plaintiff attempted to vote; and it is manifest that an election at which they are chosen necessarily pertains to school matters. If women cannot vote at the municipal election, they can have no voice in the control or management of the schools of Racine; and the act of 1885 will be inoperative in that city and, indeed, in most if not all of the cities of the state. The only elections pertaining *exclusively* to school matters are to be found in school-district meetings. If the legislature had intended a limitation to school districts of this right of suffrage, they certainly would have used terms to designate such intent. The clear intention of the act is, in recognition of the vast importance to

the state of school matters, and assigning that as a reason, to extend to women full and complete suffrage at all elections affecting in any manner the schools of the state.

The following opinion was filed January 31, 1888:

CASSODAY, J.   The plaintiff, a woman of lawful age and a citizen of this state and the United States, and long a resident of the Second ward of the city of Racine, claimed the right to vote under and by virtue of ch. 211, Laws of 1885; and accordingly offered to vote in that ward at the last annual municipal election in that city, for candidates for the respective offices of mayor, city clerk and comptroller, alderman, and supervisor.   The defendants, as inspectors of such election for that ward, refused to receive her vote or allow her to swear it in.   This action is to recover damages sustained by reason of such refusal.

1. It is contended on the part of the defendants that the chapter under which such right is claimed is wholly inoperative, because it was never adopted as required for an amendment to the constitution by art. XII, Const. of Wis. That article requires that any such amendment "shall be agreed to by a majority of the members elected to each of the two houses," in two successive legislatures, and then approved and ratified by the people, before it becomes binding.   The act in question was only so agreed to by one legislature, and then approved and ratified by the people at the general election in the following year.   There is no claim that such adoption was in compliance with that article of the constitution.   On the contrary, it is contended on the part of the plaintiff that under another article of the constitution it was competent to "extend, by law, the right of suffrage" to women, if "submitted to a vote of the people at a general election, and approved by a majority of all the votes cast at such election."   Subd. 4, sec. 1, art. III, Const. of Wis.   Such was manifestly the opinion of

the members of the legislature enacting it. It is conceded that the chapter in question was so agreed to, and then so submitted and so approved. The contention is, however, that women do not belong to the class of "persons" to whom "the right of suffrage" may thus be extended "by law." The argument is that such "right of suffrage" could only be so extended "by law" to such "persons" as were not "enumerated" in "classes" in that article, but otherwise having the qualifications therein required. That is to say, according to the argument, such right could only be so extended to such " male " persons, " of the age of twenty-one years or upwards," as had "resided in the state for one year next preceding any election," and did not belong " to either of the . . . classes " therein "enumerated." Sec. 1, art. III, Const. of Wis., amended by ch. 272, Laws of 1882. Omitting the clauses not bearing upon the question here being considered, and the section reads: "Every *male* person of the age of *twenty-one years* or upwards, *belonging to either of the following classes,* who shall have *resided* in the state for *one year* next preceding any election, shall be deemed a *qualified elector* at such election: (1) Citizens of the United States; (2) persons of foreign birth, who shall have declared their intention to become citizens; . . . (3) persons of Indian blood, who have . . . ; (4) civilized persons of Indian descent, not members of any tribe: *provided,* that the legislature may at any time *extend, by law,* the right of suffrage *to persons not herein enumerated,"* etc.

It will be observed that the section only declares such persons to be qualified electors as belong to one of the four enumerated classes, each of which must be composed of males of the requisite age, having the requisite duration of residence. Thus, it is said to have been within the power of the legislature to so extend the right of suffrage to "every male colored inhabitant," of the requisite age and duration

of residence, by ch. 137, Laws of 1849, as was held, if not conceded, in *Gillespie v. Palmer*, 20 Wis. 544. This removed one of the conditions which formerly attached to the first class, which then read, "(1) *White* citizens of the United States."

The argument that the right of suffrage could only be extended in this way to other *classes* of persons not therein enumerated, but having the general qualifications mentioned, is certainly very plausible. But the language is not "that the legislature may at any time extend, by law, the right of suffrage to" such other "male" persons or classes having the general qualifications mentioned, but "to *persons* not *herein* enumerated." In neither of the four classes do we find the word "male," and yet it is .only male persons of the classes described, and having the other qualifications mentioned, that are therein declared to be qualified electors. But the enumeration therein mentioned is not confined to such male persons thus classified, but extends to any persons therein "[*herein*] enumerated;" and may refer to any persons mentioned anywhere in the section. If this is so, then suffrage may be so extended to any persons not .mentioned in the section. Certainly women were not therein enumerated when this chapter was enacted. "Every male person," however, was mentioned therein, and then by subsequent language his qualification as an "elector" was made to depend upon age, residence, and other conditions named.

. It is true, as claimed, that this section of the constitution must be regarded as an implied limitation upon the legislative power of the state. Otherwise there would have been no object in making it a part of the constitution. But it contains a proviso which, to a certain extent, prevents such limitation from becoming operative. This is done by affirmatively declaring "that the legislature may at any time *extend, by law,* the right of suffrage to *persons not herein* enumerated." The power to thus extend the right of suf-

frage is certainly not in terms confined to males. Had it been so intended it could have been very easily so expressed. Such confinement can only rest on mere inference, if at all; and such inference must arise, from the circumstance that only certain classes of male persons are therein made qualified electors, leaving other classes still disqualified. But the extension of such right was expressly authorized "to persons not" therein "enumerated," generally, without any mention of sex. This preservation of power to so extend the right of suffrage was manifestly intended to relieve the legislature to that extent from the limitations which otherwise would have fastened upon it. To that extent, then, the power of the legislature, when so approved, was left unlimited. The exercise of such power is not restricted to males, nor prohibited from being exercised as to. females, unless by implication of a remote and argumentative character.

The question is not whether the constitution conferred the power to so extend the right of suffrage to women, but whether it anywhere expressly or by *necessary* implication prohibited the exercise of such power. It is not contended that there is any prohibition upon the exercise of such power in the constitution of the United States. There was a time when it was strenuously urged that the fourteenth amendment of that instrument, giving to all the right of citizenship, and prohibiting any state from abridging "the privileges or immunities of citizens of the United States," also conferred the right of suffrage upon women, but the supreme court of the United States held otherwise. *Minor v. Happersett*, 21 Wall. 162. According to their construction of the recent amendments, the matter of suffrage was left with the several states, subject to certain conditions. *Ibid.; U. S. v. Reese*, 92 U. S. 214; *U. S. v. Cruikshank*, 92 U. S. 542. The limitation upon the power to so extend the right of suffrage to women must, therefore, be found in the constitution and laws of this state, or it does not exist at all. It is certainly

not to be found there in express terms. Nor do any of us think it can be found there by *necessary* implication. Mere inferences and doubts as to the true construction of the language employed will not justify the abrogation of a legislative enactment. To authorize the court to declare the act void, it should clearly appear to be in violation of the organic law. This is the established rule. We must hold the act in question to be a valid law.

2. Did ch. 211, Laws of 1885, confer upon the plaintiff the right to vote at the election mentioned for the officers named? The act is entitled: "An act relating to the exercise of the right of suffrage by women *upon school matters*." The first section declares, in effect, that "every woman who is a citizen of this state, of the age of twenty-one years or upwards, . . . who has resided within the state one year, and in the *election district* where she offers to vote ten days next preceding *any election pertaining to school matters*, shall have a right to vote *at such* election." The second section provided for the submission of the act for the approval or disapproval of the electors of the state at the general election in November, 1886. The third section provided for taking the vote thereon " by separate ballot," and the form of such ballot in these words: " For woman suffrage *in school matters*," or " Against woman suffrage *in school matters*." On the part of the defendants, it is claimed that such right only extends to the voting directly for school officers. Upon the part of the plaintiff, it is contended that such right extends to the voting for any officer having any duties pertaining to school matters however remotely.

In the city of Racine, unlike some cities in the state, the charter provides that " the public schools in said city shall be under the supervision and management of the board of education, consisting of one school commissioner from each ward. Such commissioners shall be appointed by the mayor,

subject to confirmation by the common council." Title
XV, Charter. [See tit. XV, ch. 313, Laws of 1876, as
amended by sec. 10, ch. 59, Laws of 1879, sec. 13, ch. 133,
Laws of 1882, and sec. 15, ch. 122, Laws of 1887.] All
contracts entered into by such board, except with teachers,
are to be countersigned by the city comptroller, who is to
keep an account of the liabilities incurred by the board for
each current year, and report the same to the council. The
board of supervisors, in which cities are represented, exer-
cises all the legislative functions of the county as a body
corporate. Secs. 662, 669, 670, R. S. For these reasons, it
is claimed that the election of each of the four officers
named — mayor, clerk and comptroller, alderman, and super-
visor — was "an election pertaining to school matters,"
within the meaning of the act. It is moreover claimed
that the words employed in the act were aptly chosen, and
clearly express such right to vote at such municipal election
for such officers. But when asked whether such right also
extended to the election of governor and other state officers,
the able counsel, notwithstanding his special study of the
subject, frankly admitted that he was not yet prepared to
answer the question. If the plaintiff had the right to cast
the vote offered, then it would be very difficult, if not im-
possible, to give any substantial reason for rejecting her
vote for most, if not all, state officers,— for they certainly
perform duties no more remotely "pertaining to school mat-
ters" than such municipal officers, and some of them far
more directly. The same is true as to the several county
officers, members of the legislature, judges of the courts,
and perhaps members of Congress. In fact, an appeal was
made for such extended construction, based upon the sup-
posed social, ethical, and political right to such suffrage.
Had such appeal been addressed to the legislature, hav-
ing power to act in the premises, it might have had the
effect of securing the extended rights now contended for,

and in such clear and unmistakable language that no one could fail to comprehend them. But, as conceded by counsel, courts have no power to grant suffrage to any one, but are confined to the exercise of judicial powers. To attempt, under the guise of a liberal construction, to extend the act to objects beyond its purpose, would be nothing less than the usurpation of powers not only belonging to the legislature but to the qualified electors of the state. The same would be true of any attempt, under the guise of a narrow construction, to withdraw the act from any of the objects within its legitimate scope. The plain duty of the court is, under the well-established rules of law, to declare the intention of the legislature as expressed in the act,— nothing adding, nothing subtracting. When the language of an act is clear and explicit, then construction is not permissible; or, rather, the act construes itself. But when the language is ambiguous, we may resort to the history of the bill in the legislature, as well as to the established rules of construction.

On March 10, 1885, "the special joint committee on woman suffrage," in the legislature, reported three several senate bills, numbered respectively 164, 208, 277, and one memorial to Congress, numbered 2, senate, with recommendations for and against. Senate Jour. 325. Bill No. 164 S. was "A bill to extend the right of suffrage to women," and was indefinitely postponed by the senate, March 11, 1885. Senate Jour. 347. The memorial to Congress, No. 2 S., was "for a sixteenth amendment to the constitution of the United States, granting the right of suffrage to women;" "was refused engrossment and third reading" by the senate, March 13, 1885, and thus defeated. Senate Jour. 366. Bill No. 277 S. was "A bill to grant municipal suffrage to women;" and "was indefinitely postponed," March 17, 1885. Senate Jour. 383. Bill No. 208 S. was "A bill relating to the exercise of the right of suffrage

by women upon school matters;" and passed the senate, March 13, 1885. Senate Jour. 367. That bill subsequently passed the assembly with amendments, which were concurred in by the senate, and the same is the law in question.

Thus it appears that within a few days of the time when the bill incorporated into this law passed the senate, that body effectually defeated "a bill to extend the right of suffrage to women," a memorial to Congress for an " amendment to the constitution of the United States granting the right of suffrage to women," and " a bill to grant municipal suffrage to women." In view of these facts, can any impartial mind deliberately conclude that, notwithstanding the nature of the bills and memorial thus defeated, and some of them after a contest at a special hour previously fixed, the same body could for a moment suppose that by this enactment they were securing to women the same rights of suffrage thus proposed to be secured by the several bills and memorial thus defeated, or any of them? An affirmative answer to this question cannot be secured on the theory of the survival of the fittest. It can only be obtained by convicting an honorable body of intelligent men of the folly of defeating what they wanted to secure, or adopting what they wanted to defeat. Still, if such is the manifest purpose of the act as expressed in the language employed, then the courts are bound to so declare, any inferences arising from the history of the bill to the contrary notwithstanding.

Turning to the act itself, we are necessarily forced to the conviction that it was never intended thereby to extend an unlimited right of suffrage to women. If it had, the words, " upon school matters," never would have been embraced in the title; and the words, " pertaining to school matters," never would have been left in the first section; and the form of the ballot in submitting the vote would not have contained the words, " in school matters." These several ex-

pressions are necessarily limitations upon the word "suffrage" and the word "election." While the words "suffrage" and "election" are each general in themselves, yet, as here used, they must each, upon well-established rules of construction, "be restrained unto the fitness of the matter,"— that is "school matters." *Gillespie v. Palmer*, 20 Wis. 559; *Webster v. Morris*, 66 Wis. 366. It was only the right to vote at "any *election* pertaining to school matters" that was thereby attempted to be conferred. This is in accordance with the action of the senate in defeating the bill and the memorial, in each of which it was proposed to give women the unlimited right of suffrage.

The bill, as it originally passed the senate, contained, in place of the words, "and in the election district where she offers to vote," now found in the act, the words, "and within *the city* or town in which she claims a right to vote." The striking out of these last words, and inserting the former, was made by way of amendment in the assembly, March 26, 1885 (Assem. Jour. 814), and was concurred in the next day by the senate (Senate Jour. 484). One of the apparent objects in making such change would seem to have been to dispel any inference which might otherwise have arisen favorable to the right of women to vote at town meetings or municipal elections, the latter of which had been defeated some ten days before. The change seemed to contemplate that the voting would only be in "election districts," in contradistinction to the election of officers generally in towns and cities. School officers are mostly elected in districts. Secs. 424–432, 703, R. S. Of course, a town, village, ward, or city, or some subdivision thereof, may constitute an election district; and one object of making the change may have been in view of the right of women to vote for all school officers.

Much was said, upon the argument, as to the meaning of the word "pertaining." It was claimed to be of ancient

origin. It is said to be a sacred word. That may depend upon its use, and the subject to which it is applied. Here it is applied to schools, than which few things are more sacred, and in which none are more interested than women. We apprehend, however, that the meaning of the word is well understood. Manifestly, such right to vote is only given at an "*election* pertaining" or relating "to school matters." It is only "at *such* election"— that is to say, at such qualified election — that such right of suffrage can be exercised. And what are we to understand by the word "election" as thus qualified? When standing alone it is defined as "(1) the act of choosing; choice; the act of selecting one or more from others. Hence, appropriately, (2) the act of choosing a person to fill an office or employment, by any manifestation of preference, as by vote, uplifted hands, or *viva voce*." Imperial Dict. Webster gives substantially the same definition, but uses the word "ballot" instead of vote. Such qualified election, therefore, must mean "the act of choosing a person to fill an office or employment" in "school matters;" otherwise "*such* election" would not pertain or relate to school matters. An election for the choosing of any school officers or school employees would be an "election pertaining to school matters;" and after very careful consideration we are convinced that the choosing or selecting of any other officers is not an "election pertaining to school matters," within the meaning of the act.

It is the character of the *election itself* which determines the right of women to participate in it. The mere fact that a city, county, or state officer may, as incident to his office, be required to do some act which may more or less remotely affect schools, does not make the election of such officer one pertaining to school matters. The act of the person so choosing or selecting by vote or ballot, must itself relate to school matters. Under the charter of Racine the mayor was required to nominate, and

with the approval of the common council appoint, school commissioners, whose duties pertained to school matters, but the act of electing or choosing a mayor was in no sense the act of electing or choosing such school commissioners. Much less was it so with the other officers proposed to be voted for on the ballot offered. In some cities such commissioners are elected by the people. Where the statutes require such commissioners, or other school officers, to be voted for upon the same "ballot or piece of paper," upon which are the names of other "persons voted for by such elector," it would seem that the inspectors of election are not authorized to receive the votes of women, even for such school officers, since to do so would open the door for illegal votes to be cast for such other persons without any possibility of prevention or detection. The obvious reason for this is that such inspectors are expressly forbidden to open any ballot, or to permit it to be opened or examined, but are required to deposit the same in the box. Sec. 32, R. S. After such deposit, it would, of course, become impossible to tell which ballots had been cast by electors qualified to vote for all officers to be chosen at such election, and those which were cast by persons only qualified to vote for such school officers. The oath of inspectors requires them to perform their duties as such, "according to law." Sec. 28, R. S. Any departure might subject them to severe punishment. It may, therefore, require further legislation to secure the full benefits of the rights sought to be conferred by ch. 211, Laws of 1885. In this respect, it may be like many provisions of our state and national constitution, which do not execute themselves, but require legislation in order to become effective.

3. The complaint alleges that the plaintiff " was a legally qualified elector at such municipal election, . . . and was entitled to vote . . . at said election." These allegations must be regarded as mere conclusions of law from

Schilling, Adm'x, etc. vs. The Chicago, Milwaukee & St. Paul R. Co.

the facts therein stated.   The demurrer was an admission of such facts, but not of such mere conclusions. *Pratt v· Lincoln Co.* 61 Wis. 62; *Williams v. Williams,* 63 Wis. 72.

*By the Court.*— The order of the circuit court is reversed, and the cause is remanded for further proceedings according to law.

A motion for a rehearing was denied March 27, 1888.