THE HONORABLE, THE ASSEMBLY, Legislature
By Assembly Resolution No. 29, YOU have inquired as to the constitutionality of 1973 Senate Bill 59 by which the class of persons eligible to participate in both metropolitan sewerage district and town sanitary district bond elections would be expanded to include nonresident property owners.
By virtue of the adjournment provisions of 1973 enrolled joint resolution 4, Senate Bill 59 may be presumed to be adversely acted upon and, therefore, dead. Nevertheless, I deem the constitutional question raised to be of sufficient continuing importance to justify discussion and answer for your future guidance. It is for this reason that I have answered your inquiry.
Sections 66.20 through 66.26, Stats., provide for the establishment of a metropolitan sewerage district, governed by a commission, to provide sanitary collection and treatment services for the district. Section 66.25, Stats., provides for the financing of the necessary facilities by special assessment against property receiving services or by levying a tax upon the taxable property in the district or by assessing users with a service charge. Further, in order to spread the tax burden upon property owners or users of the service over a long period of time, subsec. (6) of the statute authorizes a district to finance new facilities by borrowing through the issuance of bonds pursuant to a resolution adopted by the metropolitan sewerage district commission. However, subsec. (7) (b) of sec. 66.25, Stats., *Page 392 
provides a referendum procedure which, if invoked, requires that the borrowing resolution adopted by the governing body be submitted in a special election "to a vote of the electors of the district" for approval.
Sections 60.30 through 60.316, Stats., provide a similar statutory framework for the establishment and financing of a town sanitary district, which is also governed by a commission. Subsection (1) of sec. 60.307, Stats., authorizes such a district to borrow money by the issuance of bonds pursuant to a resolution adopted by the town sanitary district commission. In the event the referendum procedure there provided is invoked, subsec. (3) directs that the resolution be submitted in a special election "to a vote of the electors of said district."
1973 Senate Bill 59 was apparently proposed for the purpose of amending the referendum provisions of secs. 66.25 (7) (b) and60.307 (3), Stats., so as to provide for submittal of bond issue resolutions to the vote of both the electors of the district and nonresident property owners. Thus, initially we must examine the proposed amendments in the bill to determine if the apparent purpose so intended was clearly effectuated.
Amended sec. 60.307 (3), as appearing in 1973 Senate Bill 59, reads in part as follows:
 "Such resolution shall be submitted to a vote of the electors of said district and all individuals who hold title of record to any lands in the district and who would otherwise be eligible to vote had they resided in the district for the required time, if, . . . a petition requesting said submission, [is] signed by electors numbering at least . . . 10% of the votes cast for governor in the district at the last general election. . . ."
 Section 66.25 (7) (b), Stats., would be amended by the bill to read in part:
 "Such resolution shall be submitted to a vote of the electors of the district if, . . . a petition requesting the submission, [is] signed by electors numbering at least 10% of the votes cast for governor in the district and all individuals who hold title of record to any lands in the district and who would otherwise be *Page 393 eligible to vote had they resided in the district for the required time, at the last general election . . ."
In essence the amendment to sec. 60.307 (3), Stats., would permit both electors and nonresident property owners to vote on metropolitan sewerage district bond issues in the event a valid petition is filed by 10% of the electors voting in the last gubernatorial election, thus invoking the referendum procedure. On the other hand, the amendment to sec. 66.25 (7) (b), Stats., would appear to permit only electors to vote in town sanitary district bond elections, providing a valid petition invoking the referendum procedure is filed by electors and nonresident property owners. Reading both proposed amendments in their entirety, it does not appear that the obvious inconsistency between their provisions was intended, but rather, may have arisen inadvertently in the drafting process. If, as it would appear, both proposed amendments were intended to effectuate the same purpose, namely, to permit nonresident property owners to have a voice in voting on the subject bond issue referendums, redrafting would obviously be necessary to make the two provisions consistent in that regard.
Assuming that a bill such as 1973 Senate Bill 59 were so redrafted, I am of the opinion that the limited extension of voting rights contemplated will not infringe the local district electors' federal or state constitutional guarantees of equal protection. In light of the fact that the ultimate financial burden for sanitary facilities in a district is imposed on the property owner, the legislature could reasonably conclude that it would be equitable, considering his pecuniary interest, to permit the nonresident property owner to participate in the referendum process relating to the bond issues directly imposing that burden. However, if such extension of voting rights did not include the right to petition, the denial of that right could well be challenged on the basis that the right to petition is an integral part of the voting rights exercised under the subject statutes and that such rights must be fully extended to nonresident property owners on the same basis as electors.
The United States Supreme Court has had several recent opportunities to construe the limits of the Equal Protection Clause with regard to state legislation establishing voter classifications on the basis of the ownership of property. The common thread in the *Page 394 
decisions of the U.S. Supreme Court appears to be the court's concern that the distinctions created by a classification affecting the exercise of the voting franchise actually support the interest which the state claims to be protecting.
Thus, in Kramer v. Union School District (1969), 395 U.S. 621,89 S.Ct. 1886, 23 L.Ed.2d 583, 590 (school election), Cipriano v.City of Houma (1969), 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647
(revenue bond election) and City of Phoenix v. Kolodziejski
(1970), 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (general obligation bond election), the court held that the denial of the right to vote of some residents, based on property ownership qualifications, constituted a denial of equal protection of the law, since such qualification did not reasonably relate to or meet a legitimate state goal. The different circumstances existing in Salyer Land Company v. Tulare Lake Basin WaterStorage District (1973), 410 U.S. 719, 93 S.Ct. 1224,35 L.Ed. 659 (election of district directors), and Associated Enterprises,Inc., and Johnston Fuel Liners v. Toltec Watershed ImprovementDistrict (1973), 410 U.S. 743, 93 S.Ct. 1237, 35 L.Ed.2d 675
(referendum re creation of district), led to different results. These decisions upheld the validity of the California Water Storage District Act and Wyoming Watershed Improvement District Act respectively, which permitted only landowners to vote and denied the franchise to otherwise qualified residents.
While the above federal cases demonstrate that property ownership or tax paying may be a legitimate qualification for voting under certain circumstances, such decisions concern state legislation which attempts in some way to restrict the exercise of the voting franchise to property owners. On the other hand, 1973 Senate Bill 59 does not purport to restrict the voting franchise in sanitary district bond issue elections to electors who are property owners or even just to property owners. In essence, the bill would expand the group eligible to participate in the bond referendum process to include nonresident property owners.
The question of an expanded voter franchise in general elections, so as to include nonresident property owners, has been the subject of much litigation in both the state and federal courts of Georgia. That state's Supreme Court has upheld such an expansion even where it *Page 395 
was limited to nonresident owners of property in a particular municipality. Bobo v. Mayor and Councilmen of the Town ofSavannah Beach (1960), 216 Ga. 12, 114 S.E.2d 374, appeal dismissed by Supreme Court for want of a substantial federal question, 364 U.S. 409, 81 S.Ct. 181, 5 L.Ed.2d 185. Likewise, the federal courts held, in Spahos v. Mayor and Councilmen ofSavannah Beach, Tybee Island, Georgia (S.D. Ga. 1962),207 F. Supp. 688, affirmed per curiam, 371 U.S. 206, 83 S.Ct. 304,9 L.Ed.2d 269, that such an expansion of the electorate does not violate a resident's civil rights under the Equal Protection Clause of the Fourteenth Amendment, stating, at 207 F. Supp. 692:
 "The objective of the legislature here was undoubtedly to permit those persons owning property within the municipality, many of whom were summer residents therein, to have a voice in the management of its affairs. This appears to be a rational objective and the plaintiffs have failed to show that the classification thereunder is arbitrary or unreasonable." (Emphasis added.)
Therefore, I conclude that the proposed limited expansion of the franchise to include nonresident property owners of the subject districts would not constitute a denial of equal protection to resident electors of such districts. As previously indicated, however, if such voting rights were granted, the courts might find that a refusal to allow nonresident property owners to also join with electors in petitioning for an election would be constitutionally objectionable on equal protection grounds.
A bill such as 1973 Senate Bill 59 must also be considered in reference to the provisions of Art. III, sec. 1, Wis. Const., which defines an elector as follows:
 "Every person, of the age of twenty-one [now eighteen] years or upwards, belonging to either of the following classes, who shall have resided in the state . . . next preceding any election, and in the election district where he offers to vote such time as may be prescribed by the legislature, not exceeding thirty [now ten] days, shall be deemed a qualified elector at such election:
"(1) Citizens of the United States. *Page 396 
 "(2) Persons of Indian blood, who have once been declared by law of congress to be citizens of the United States, any subsequent law of congress to the contrary notwithstanding.
 "(3) The legislature may at any time extend, by law, the right of suffrage to persons not herein enumerated; but no such law shall be in force until the same shall have been submitted to a vote of the people at a general election, and approved by a majority of all the votes cast on that question at such election; and provided further, that the legislature may provide for the registration of electors, and prescribe proper rules and regulations therefor."
This constitutional provision contains no property qualification, but it does set forth age limitations and requires residence in an election district precedent to exercising the franchise as an elector. As stated in State ex rel. Wannemaker v.Alder (1894), 87 Wis. 554, 558, 58 N.W. 1045:
 ". . . By the constitution (art. III, sec. 1) an elector must reside in the election district where he offers to vote. . . ."
Further, Article III, sec. 1, para. (3), Wis. Const., clearly provides that a proposal to extend the right of suffrage to persons not enumerated in Art. III must be approved by a referendum of the voters in a general election. 44 OAG 106 (1955), 50 OAG 50 (1961).
Generally, the enumeration in the Constitution of the qualifications of electors is the complete and final test as to who shall be permitted to vote, and such qualifications can be altered only by constitutional amendment. However, the legislature may prescribe voter qualifications for elections not provided for in the state Constitution. 25 Am. Jur. 2d Elections, sec. 60, p. 753. In addition, statutes prescribing property qualifications to vote on financial questions have been held not to conflict with such constitutional provisions. 25 Am. Jur. 2dElections, sec. 59, p. 752 and sec. 79, p. 770.
Therefore, it might be argued that the "elections" to which the voter qualifications set forth in Art. III, sec. 1, Wis. Const., refer, do not include referendum elections on propositions to incur bonded indebtedness, and that the legislature may establish different voter *Page 397 
qualifications in reference to such elections, as long as such qualifications are otherwise constitutional. See 25 Am. Jur. 2dElections, sec. 2, p. 692. It has been held, for instance, that the state constitutional voter regulations applicable to persons seeking public office and to voting at "any election," which regulations provided that no property qualification could be required, related only to elections contemplated by the Constitution and did not apply to prevent a legislature from creating drainage districts directed by freeholders elected by resident taxpayers. State ex rel. Gilson v. Monahan (1905),72 Kan. 492, 84 P. 130. Also, in Menton v. Cook (1907),147 Mich. 540, 111 N.W. 94, the court held that the submission of a proposition to borrow money and issue bonds for a city hall and firehouse was not an "election" within the state constitutional provision which prescribed the qualifications of electors, so that the legislature was authorized to limit the right to vote at such election to electors who were taxpayers.
It has likewise been held that a constitutional provision which provided that male citizens having prescribed qualifications were entitled to vote at all "elections" related to elections for the choice of officers alone and did not prohibit a legislature from authorizing women to vote on the issuance of bonds, borrowing money, or increasing the tax levy. Coggeshall v. City of DesMoines (1908), 138 Iowa 730, 117 N.W. 309. Other cases concluding that the term "election" in state constitutional provisions prescribing election regulations or voter qualifications apply only to elections for the choice of public officers and not to referendum-type votes: Schieffelin v. Komfort (1914),163 App. Div. 741, 149 N.Y.S. 65 (referendum re constitutional convention), Oregon-Wisconsin Timber Holding Co. v. Coos County
(1914), 71 Ore. 462, 142 P. 575 (election to authorize special tax in road district), Mayor, etc., of Town of Valverde v.Shattuck (1893), 19 Colo. 104, 34 P. 947 (election to determine annexation), Bliss v. Hamilton (1915), 171 Cal. 123, 152 P. 303
(election re formation and bonding of county irrigation districts).
In State ex rel. Knowlton v. Williams (1856), 5 Wis. 308, 314-315, the court did describe the "voters" which are authorized by Art. XIII, sec. 8, Wis. Const., to vote on the removal of a county seat as "those who have a right to vote at the elections held for the purpose of choosing state officers," and referred to Art. III, sec. 1, Wis. Const., *Page 398 
as setting forth the qualifications of such voters. It can also be pointed out, of course, that the Constitution does set forth a number of individual provisions requiring that the election of particular officers or the submission of specific questions be committed to voters having the requisite constitutional qualifications. Arguably these are the only elections to which Art. III, sec. 1, refers in establishing elector qualifications for "any election."
Therefore, there is authority to support the conclusion that the voter qualifications set forth in Art. III, sec. 1, Wis. Const., need not be viewed as exclusive, at least insofar as bond referendum elections in sanitary districts are concerned. In fact, cases such as those described above strongly influenced one of my predecessors when considering whether the legislature could constitutionally restrict voting at local elections on bond issues. 10 OAG 58 (1921). In that opinion the following is stated, at pages 59-60:
 "Ordinarily it could be predicted with a good deal of confidence that our court would follow the rule established by the courts of other states on this subject, but in view of the somewhat strict view that our court takes of the inherent nature of the voting right, [State ex rel. McGrael v. Phelps (1910), 144 Wis. 1, 128 N.W. 1041] it is just possible that the court would be inclined to construe sec. 1, art. III as covering all kinds of elections, and, in that event, the legislation you suggest would be unconstitutional. I believe, however, the chances are pretty strongly in favor of such a law being held valid, especially in view of the very reasonable and logical distinction between elections for the choosing of officers and elections which would place heavy burdens of indebtedness upon the taxpayers."
The obvious weight and persuasiveness of the foregoing cases from other states must be acknowledged. As pointed out in 10 OAG 58, however, it cannot be stated with complete assurance that our court would so hold, since the right to vote has long been treated by our court as a broad and fundamental right. State exrel. McGrael v. Phelps, supra, pages 14-15; State ex rel. LaFollette v. Kohler (1930), 200 Wis. 518, 547, 228 N.W. 895; Stateex rel. Barber v. Circuit Court (1922), 178 Wis. 468, 473,190 N.W. 563; State ex rel. Frederick v. Zimmerman (1949), 254 Wis. 600,613, 37 N.W.2d 472, 37 N.W.2d 473; Gradinjan v. Boho
(1966), 29 Wis.2d 674, *Page 399 
684-685, 139 N.W.2d 557. In addition, there is other, more direct Wisconsin precedent, not treated in 10 OAG 58, which leads me to reject that opinion and conclude that our court probably would hold that any extension of suffrage such as that contemplated under 1973 Senate Bill 59 must be submitted to a vote of the electors of the state under Art. III, sec. 1, Wis. Const.
Our own court appears to have given some indication that "elections" under Art. III, sec. 1, may include those which involve referendum-type votes on questions relating to bonding.Hall v. Madison (1906), 128 Wis. 132, 107 N.W. 31. The Hall case arose under an act of the legislature which had extended the right of suffrage in "any election pertaining to school matters" to women on much the same terms as the general right of suffrage possessed by men. The law had been submitted to a vote of the people pursuant to Art. III, sec. 1, Wis. Const. While arguably the court was only considering whether a school bond referendum was an "election" within the meaning of ch. 211, Laws of 1885, the court did hold that the school "elections" referred to in the law under attack, which law was "essentially a part of the constitution," included elections held on the question of the issuance of bonds for school purposes as well as elections for the purpose of choosing school officers. Noting that "election" was generally defined as "the act of choosing; choice," Brown v.Phillips (1888), 71 Wis. 239, 253, 36 N.W. 242, the court stated that "Whether it is a choice between alternative policies or a choice between persons, it is equally an election." Hall, supra, p. 138.
The Hall case has subsequently been cited and relied on by the court in Vulcan Last Co. v. State (1928), 194 Wis. 636, 640,217 N.W. 412, where the court held that a referendum on the question of issuing bonds for the construction of a waterworks was an "election," and both Hall and Vulcan were cited in Otey v. CommonCouncil of City of Milwaukee (E.D. Wis. 1968), 281 F. Supp. 264,276, Chief Judge Tehan writing: ". . . virtually since its inception, the direct referendum in Wisconsin has been deemed a conventional form of election. . . ." See also State ex rel.Birchmore v. State Board of Canvassers, et al., (1907), 78 S.C. 461,59 S.E. 145 and Taylor, et al. v. Independent School Dist.of Earlham (1917), 181 Iowa 544, *Page 400 164 N.W. 878, where constitutional references to "elections" were held to include referendum-type votes.
RWW:JCM