Hall v. Madison, 128 Wis. 132.

HALL, Appellant, vs. CITY OF MADISON and others, Respondents.

*March 26—April 17, 1906.*

(1) Stare decisis. (2–8) *Elections: "School matters:" Right of women to vote: Who are "electors:" Bonding city for school house: Territory attached to city for school purposes: Right of its electors to vote: Limitation of amount to be borrowed: Repeal of statute.*

1. To overcome the rule of *stare decisis* and justify the overturning of a carefully considered decision of this court because of the discovery of a new argument not suggested when the decision was made, that argument should be of such convincing cogency as to compel belief not only that the decision was legally indefensible but that it would be palpably wrong to permit it to stand.

2. The question whether women might (under ch. 211, Laws of 1885) vote at an election not involving the selection of officers but involving merely the decision of a question pertaining to school matters, was not decided in *Brown v. Phillips*, 71 Wis. 239, or *Gilkey v. McKinley*, 75 Wis. 543.

3. An "election," within the meaning of the statutes of this state, includes a referendum vote to decide a question of policy, as well as an ordinary election to choose between candidates for public office.

4. An election to determine whether a city shall issue bonds for the purpose of building a school house is an "election pertaining to school matters" within the meaning of ch. 211, Laws of 1885.

5. The word "electors" in sec. 943 (providing for submission to the electors of the question of issuing bonds) means the electors qualified by law to vote on any given proposition and therefore, in respect to an election pertaining to school matters, includes women, they being fully qualified constitutional electors at such an election.

6. Ch. 288, Laws of 1893 (subd. 6, sec. 12, Stats. 1898), not having been submitted to the people, could not add to or subtract from the right of suffrage upon school matters given to women by ch. 211, Laws of 1885. All that the legislature could do, without such submission, was to provide the machinery for executing the law of 1885, as was done by ch. 285, Laws of 1901.

7. Contiguous portions of a town having by statutes been attached to a city for school purposes in order, merely, that the inhabitants of such territory might send their children to the city schools upon payment of their share of the expense of operating such schools, such inhabitants have no right to vote upon the question of bonding the city to build a school house.

8. Sec. 926—11, Stats. 1898, giving to all cities operating under special charters the power to issue bonds for the erection of school buildings, operated to repeal ch. 295, P. & L. Laws of 1861, so far as that act limited the power of the city of Madison to borrow money and issue bonds for a high school.

MARSHALL and KERWIN, JJ., dissent.

APPEAL from an order of the circuit court for Dane county: CHESTER A. FOWLER, Judge. *Affirmed.*

For the appellant there were briefs by *Bird, Gilman & Hobbins* and *Charles F. Lamb,* counsel, and oral argument by *Mr. G. W. Bird* and *Mr. Lamb.*

For the respondents there was a brief by *A. C. Hoppmann,* attorney, and *Jones & Schubring,* of counsel, and oral argument by *Mr. B. W. Jones* and *Mr. Hoppmann.*

WINSLOW, J. This is a taxpayer's action in equity to restrain the city of *Madison* and its officers from issuing corporate bonds for the construction of a high school building. A general demurrer to the complaint was sustained, and the plaintiff appeals. It will only be necessary to state very briefly the substance of the complaint. It alleges that the common council of the city passed an ordinance authorizing the issuance of corporate bonds in the sum of $250,000 for the erection of a high school building in the city; that, pursuant to petition of more than one tenth of the voters, a special election was called and held at which 1,380 male voters voted for and 1,518 against the issuance of bonds, and 1,098 female voters voted for and 673 against the issue. The complaint also alleges that a part of the town of Blooming Grove is attached to the city of *Madison* for school purposes, and is a part of the school district, and that the voters of said at-

tached territory were not allowed to vote at such election. Certain alleged legal limitations on the power of the city to issue bonds are also pleaded, which will be more fully stated later in this opinion.

From the foregoing statement it appears that, according to the allegations of the complaint, the proposition to issue bonds was defeated if the votes of males only should have been counted, but was carried if the votes of females should also be counted; so the question at once arises whether women are entitled to vote at such an election. The election in question was called and held pursuant to the provisions of sec. 943, Stats. 1898, as amended by ch. 312, Laws of 1903, which provides that no bonds shall be issued by any town, village, or city until the proposition shall have been submitted to the *people* of the municipality and adopted by a majority voting thereon, and further provides that when any such bond issue is contemplated a special election for the purpose of submitting the question of such bonding to the *electors* shall be called and held. The law contains full provisions as to the manner of conducting such an election, and also provides that it shall not apply to the issuance of bonds for school purposes, and certain other named objects, by a city, unless demanded by a petition signed by not less than ten per cent. in number of the voters who voted in said city at the last general state election. Adult women were allowed the right to vote at the election in question in this case, on the ground that such right had been conferred upon them by virtue of the provisions of sec. 1, ch. 211, Laws of 1885, now sec. 428*a*, Stats. 1898, which provides that every woman who is a citizen of this state of the age of twenty-one years or upwards (with certain exceptions unnecessary to state), "who has resided within the state one year, and in the election district where she offers to vote ten days next preceding any election pertaining to school matters, shall have a right to vote at such election." This act was submitted to th  people at the general election

in 1886, and approved by a majority of the votes cast. The reason of this submission was that the constitution of the state, by sec. 1 of art. III, in specifying who shall be electors, limits the electorate to four classes of males, but provides that the legislature may "at any time extend by law the right of suffrage to persons not herein enumerated, but no such law shall be in force until the same shall have been submitted to a vote of the people at a general election and approved by a majority of all the votes cast at such election." By ch. 285, Laws of 1901, a sentence was added to sec. 428a aforesaid, as follows:

"Separate ballot boxes shall be furnished at every election precinct in this state at every primary, general, municipal or special election, for the use of women desiring to vote on said school matters, and separate ballots shall also be provided at said elections for the use of said women."

It should also be noted that by ch. 288, Laws of 1893, the legislature codified the laws of the state relating to electors and elections, and by sec. 1 of that act, now sec. 12, Stats. 1898, classified electors into six classes; the sixth class being defined in subd. 6 as follows:

"Every woman who is a citizen of this state, of the age of twenty-one years or upwards, who has resided within the state one year and in the election district where she offers to vote ten days preceding any election pertaining to school district matters and the election of school district officers, and who is not a pauper or excluded by sec. 2 of art. III of the constitution, may vote at any election pertaining to such matters and the election of such officers in any town, city or village in which she has so resided."

Such being the constitutional and statutory provisions bearing on the subject, the appellant claims, in substance, (1) that the constitution does not authorize the giving to any class of a right to vote at a special class of elections, but only to extend the right to vote at all elections, and hence that ch. 211, Laws of 1885, is unconstitutional; (2) that in any event the act, as construed by this court in *Brown v. Phillips,* 71 Wis.

239, 36 N. W. 242, only gives women the right to vote for school officers or employees; (3) that even if the act be held valid, and extends beyond elections for school officers, the election in question was not an election pertaining to school matters; (4) that the term "electors," as used in sec. 943, Stats. 1898, does not include women, who at best are only qualified electors.

Proceeding to the consideration of these objections, it must be said that the validity of sec. 1, ch. 211, Laws of 1885, now sec. 428a, Stats. 1898, can hardly be considered as fairly open to discussion. It was directly attacked in *Brown v. Phillips, supra,* and it was distinctly said in the opinion by the present chief justice: "We must hold the act in question to be a valid law." In the following case of *Gilkey v. Mc-Kinley,* 75 Wis. 543, 44 N. W. 762, it was said concerning it:

"That section owes its vitality to a direct vote of the electors of the state, and a like vote would doubtless be required to repeal it. Although, under the special provisions of subd. 4, sec. 1, art. III, of the constitution, sec. 1, ch. 211, Laws of 1885, is in the form of a statute, yet it is essentially *a part of the constitution.*"

It is true that in both of these cases the right of women to vote at certain elections was denied because the law was not deemed self-executing, and no machinery had been provided by law for the proper exercise of the right; it is true, also, that the precise ground of invalidity now suggested was not suggested in either of them, but in each case the law was definitely declared valid by this court. The discovery of a new argument will hardly justify the overturning of a carefully considered decision, unless, indeed, the argument be of such convincing cogency as to compel the mind to believe not only that the former decision was legally indefensible, but that it would be palpably wrong to permit it to stand. No such situation is here presented. The present argument is

ingenious, but not necessarily mind-compelling. It certainly does not possess the strength required to overcome the rule of *stare decisis.*

But it is said that this court decided, in *Brown v. Phillips, supra,* that the only right given to women by the statute is the right to vote in the choice of school officers and employees. It seems to us that a very brief consideration of that case demonstrates the fallacy of the argument. A decision is always to be construed bearing in mind the question presented. The exact question in that case is well stated in the opinion, upon page 248 (36 N. W. 245), as follows:

"On the part of the defendants it is claimed that such right only extends to the voting directly for school officers. Upon the part of the plaintiff it is contended that such right extends to the voting for any officer having any duties pertaining to school matters, however remotely."

Upon this question, thus sharply presented, the decision was as expressed upon page 253 (36 N. W. 247):

"An election for the choosing of any school officers or school employees would be an 'election pertaining to school matters' .. . . the choosing or selecting of any other officers is not an 'election pertaining to school matters' within the meaning of the act."

It is therefore clear that no question was considered or discussed save the question as to what officers women might vote for. The question whether women might vote at an election not involving the selection of officers, but involving merely the decision of a question pertaining to school matters, was neither considered nor decided, nor was it decided in the case of *Gilkey v. McKinley, supra.*

So we approach the question whether the election in question was an "election pertaining to school matters" within the meaning of the act, unembarrassed by any contrary intimation in the previous cases. In the first place it should be said that an "election," within the meaning of the statutes

of this state, includes a referendum vote to decide a question. of policy such as the issuance of bonds, the issuance of saloon. licenses or the amount thereof, just as well as it includes an ordinary election to choose between candidates for public office. The very first definition given of the word in *Brown. v. Phillips, supra,* is "the act of choosing; choice." Whether it is a choice between alternative policies or a choice between persons, it is equally an election. If further argument were needed on this proposition it would be readily found in the fact that such referendum votes are always termed "elections" by our statutes, as, for instance, a local option election (sec. 1565a, Stats. 1898), and an election to fix the saloon license fee (sec. 1548), and, to come nearer home, the very referendum in question is called an "election" by the section which requires it (sec. 943).

Being, therefore, an election, the question is: Can it be properly said to pertain to school matters? Upon this subject it is argued that the paramount question submitted is the question of the incurring a municipal debt, and that the purpose for which the debt is to be incurred is but an incident, and does not make the election one which pertains to school matters. This argument is not without force, but we cannot deem it sound. The money, if borrowed, was to be borrowed solely to build a school building; it could be used for no other purpose. Stripped to its essence, the question to be decided was: "Shall the city borrow $250,000 and build a high school therewith?" Is not the borrowing of money to build a school house an act pertaining to school matters as much as the expenditure of moneys in hand for that purpose? Suppose there were a law providing that, whenever a city proposed to build a school house or purchase a new school site costing more than a given sum, the question whether such a sum should be spent for that purpose should be submitted to vote; would not the election held under such a law be strictly an election pertaining to school matters? Would the fact

that the expenditure of municipal funds was involved take from the proposition its character as an election pertaining to school matters? In fact, does not any proposition relating to the better management of the schools necessarily involve the question of the expenditure of corporate funds? And if women are to be denied the right to vote because the expenditure or the borrowing of money is involved, does not the law become a mere husk without the kernel?

These questions bring us to the broader question of the general purpose of the law. It must, of course, be assumed that it was passed to give some substantial right to women which they did not before possess. To suppose that the legislature or the people intended by the use of vague language or glittering generalities to "make a promise to the ear and break it to the hope," or to seem to give a right which was, in fact, substantially withheld, cannot be entertained without an imputation of bad faith to both legislature and people. If the purpose had been to limit the right to school district meetings, or to voting for school officers or employees, it would have been easy to do so by simple and appropriate language. No such purpose can, in our judgment, be spelled out either from the language of the act or its title. On the other hand, the very broad and general nature of the language used indicates clearly the intent to cover a broad field rather than a narrow one. The title of the act (ch. 211, Laws of 1885) exhibits this intent most persuasively. It is: "An act relating to the exercise of the right of suffrage by women upon school matters." It is not the right to vote at school district meetings (which can only be called the right of suffrage in a limited sense), or the right to vote for school officers, but the *right of suffrage upon school matters,* to which, the legislature declares by the title, the act refers. Nor is this declaration of intent narrowed or limited by the wording of the act itself. The act, in terms, gives women the right to vote at any *election* (not at any district school meeting) "pertaining to school

matters," and further, it provides that the form of the ballots to be used by the people in voting upon the law should be: "For woman suffrage in school matters," and "Against woman suffrage in school matters." These broad general words indicate the intent to give the full right of suffrage in school matters, or else they indicate an intent to deceive by apparently giving much while in fact giving little or nothing. The latter intent cannot be entertained for a moment.

The intent being, therefore, to give broad powers, powers substantially equal to those possessed by male voters, so far as such elections are concerned, the act should be construed to effect that intent so far as possible. *Ut res magis valeat quam pereat.* There should be no narrow construction given, no paring down of the rights attempted to be given by the people's mandate. Indeed, it is difficult to see upon what ground any attempt in that direction can be justified. Theoretically, women have fully as much interest in the conduct of the common schools as men; it is common knowledge that they display more interest in them practically. The nursery is the first schoolroom of the race; the mother is the first teacher, and from her lips come the earliest and perhaps the most important lessons. When the child goes to school the great majority of its teachers, from the kindergarten to the high school, will be women, and if either parent takes any interest in its progress by visiting the school, in nine cases out of ten it will be the mother. When the legislature and the people, therefore, attempted to give to women the right to participate with men in the management of the schools, they acted upon practical, not fanciful, reasons; they did an act of tardy justice rather than an act of bounty or grace. There was no reason why they should not so participate; there was every reason why they should. Giving the law, therefore, that reasonable breadth of construction which is necessary in order to make it fulfil its evident purpose, we have no difficulty in reaching the conclusion that an election to deter-

mine whether bonds shall be issued to build a school house
is strictly and truly an "election pertaining to school mat-
ters." The difficulty found in the *Brown* and *Gilkey Cases,*
namely, that further legislation was needed in order to render
the law capable of execution, has now been removed by the
provision of the necessary machinery for receiving and count-
ing the votes of women (ch. 285, Laws of 1901), so that no·
obstacle remains in the way of giving full effect to the law.

But it is urged that when the legislature provided, by sec.
943, Stats. 1898, that bonds should not be issued by a mu-
nicipality until their issue had been approved by a majority
of the electors of the municipality, the word "electors" meant
the same body of electors in all cases; *i. e.* that it did not
mean one class of electors when the question is as to the issu-
ance of bonds to improve streets or build sewers, and a larger
class when the question is as to the issuance of bonds to build
school houses. It was directly held in the *Gilkey Case* that
ch. 211, Laws of 1885, became, after it was adopted by the
people, "essentially a part of the constitution." The class of
voters thus added to the electorate in elections pertaining to
school matters became substantially constitutional electors.
It would seem to be a very serious question whether the legis-
lature has any power to provide for an election at which only
a certain part of the electors recognized by the constitution
should be allowed to vote. For instance, could the legislature·
provide for an election to determine whether bonds should
be issued, and limit the right of voting at such election to
property owners, or to voters between certain ages? We
suggest the question, but do not find it necessary to decide·
it. If, as we now hold, this election was in fact an election
pertaining to school matters, and if, as we also hold, women
are fully qualified constitutional electors at such elections,
it must be presumed that when the legislature used the word
"electors" without qualification they used it advisedly, and
meant the electors qualified by law to vote on any given prop-

·osition.    The fact that the legislature provided that no referendum should be necessary in case of the proposed issuance ·of bonds for street improvements, school purposes, and certain other public improvements except when petitioned for by ten per cent. of the voters who voted at the last general election, seems to us as having no material or persuasive bearing.    It certainly does not indicate an intention by the legislature to deny to any constitutional elector his right to vote at the election which might be rendered necessary by the filing of the petition.    Such an intention, even if it could be effectual, should be clearly expressed.    We have not found it necessary to consider or discuss the effect of ch. 288, Laws of 1893, now subd. 6, sec. 12, Stats. 1898, upon the question. It is plain that it did not and could not add to or subtract from the act of 1885, because it was never submitted to a vote ·of the people.    The only thing that could be done by the legislature alone after the passage of ch. 211, Laws of 1885, was to provide the machinery for its execution, and this has been done by ch. 285, Laws of 1901.

Certain other objections are made by the appellant to the legality of the proposed bond issue, which will be briefly considered.    It appears by the complaint that the common schools of the city of *Madison* are operated under the provisions of ch. 295, P. & L. Laws of 1861, and certain subsequent amendments thereto.    The act named provides that the territory which is or may hereafter be included in the city of *Madison* shall constitute a separate school district; it also provides for the government of the district by a board of education of six members, to be chosen by the common council of the city, two members being chosen annually; that this board shall be a body corporate by the name of "the board of education of the city of *Madison;*" shall elect a treasurer, president, and ·clerk; shall have power to establish schools, and manage them, purchase sites, build school buildings, employ teachers, and generally manage the schools of the city, and to expend the

school funds therefor which are to levied by the common council and paid over to the treasurer of the board. The act also authorizes the school board to buy a site and erect a union or high school, for which the common council was authorized to levy a tax or borrow a sum not exceeding $10,000, and issue city bonds therefor. It further appears that various contiguous portions of the town of Blooming Grove have been attached to the city of *Madison* for school purposes, and have been required to pay taxes for the support and maintenance of the schools of the city at the same rate as the city, which taxes are paid over to the treasurer of the board of education of the city. Ch. 159, Laws of 1861; ch. 203, P. & L. Laws of 1867; ch. 127, Laws of 1877.

It is argued that the referendum vote is void because the voters in the attached territory were not allowed to vote, also because the power to borrow money to build a high school is limited to the sum of $10,000. Neither contention can be sustained. The situation of the inhabitants of the so-called attached territory seems simply to be that they have the privilege, on payment of their share of the expenses of operation of the *Madison* schools, to send their children to those schools. In this sense this territory and its inhabitants are part of the school district, but apparently in no other. The school district, so far as government is concerned, is still the territory included within the city limits of *Madison;* that city, through its board of education, purchases and sells school sites, and builds, operates, and owns its school buildings without let, hindrance, or aid from the attached territory. If new school houses must be built, the city of *Madison* builds them. The attached territory and its inhabitants receive school privileges, but do not participate in the ownership, control, or management of the schools. In this view it is clear that such inhabitants have no right to vote on the question of bonding the city of *Madison* to build a school house.

As to the $10,000 limitation contained in the act of 1861,

the objection is answered by reference to the provisions of sec. 926—11, Stats. 1898.   This is a general act passed expressly for the purpose, as its terms clearly express, of giving to all cities operating under special charters the power to issue bonds for certain purposes, among which is "the erection, construction, and completion of school buildings, and the purchase of school sites."

There are no other points made which require treatment.

*By the Court.*—Order affirmed.

MARSHALL, J. (*dissenting*).   The question involved here is not one to be viewed very much by the light of sentimental considerations, nor that of public policy.   The former may embellish truth, but does not point the way to it.   The latter may, in a proper case, make language, otherwise plain, appear to be ambiguous, and justify judicial construction, and aid in that regard, but otherwise it is a matter solely for legislative consideration.   Where words are plain and, taken as they read, lead to no absurd consequences, no consideration of public policy, in the judicial view, can legitimately create ambiguity, giving rise to opportunity and justification for varying the literal sense.   Applying the rule to a statute, "there can be no reason for refusing to admit the meaning which the words naturally present; to go elsewhere in search of conjecture in order to restrict or extend the act, would be but an attempt to elude it. . . . However luminous each clause might be, however clear and precise the terms of it, all this would be of no avail, if it be allowed to go in quest of extraneous arguments, to prove that it is not to be understood in the sense which it naturally presents."   Smith, Stat. & Const. Law, § 478.   So much as a preface to what I may say regarding the meaning of the statutes here involved and suggestion of why, from my standpoint, I cannot agree with the reasoning of my brethren as to how such statute should be understood.

Hall v. Madison, 128 Wis. 132.

Some additional prefatory remarks respecting the subject of how a judicial decision of one minor proposition among others, the solution of which by a logical process leads to the major conclusion embodied in the judgment, should be regarded upon such minor proposition becoming subsequently a major inquiry between parties not bound by the doctrine of *res adjudicata,* are appropriate at this point. That subject, in fact, is one of the most important features of this case, and we may well discuss it at considerable length.

This court and other courts have said over and over again that all propositions assumed by the court to be within the issues and all questions presented, considered, and deliberately decided by the court, leading up to the final conclusion reached, and upon which it is based, are as effectively passed upon as the ultimate question solved. There is well-nigh no end of support for that doctrine. We will content ourselves with referring to a small part thereof. *Buchner v. C., M. & N. W. R. Co.* 60 Wis. 264, 19 N. W. 56; *State v. Nat. Acc. Soc.* 103 Wis. 208, 217, 79 N. W. 220; *South Bend C. P. Co. v. Geo. C. Cribb Co.* 105 Wis. 443, 445, 81 N. W. 675; *Becker v. Chester,* 115 Wis. 90, 128, 91 N. W. 87, 650; *Carstairs v. Cochran,* 95 Md. 488, 52 Atl. 601; *Michael v. Morey,* 26 Md. 239, 261; *Allen v. Flood* (1898) A. C. 1; *Kirby v. Boyette,* 118 N. C. 244, 24 S. E. 18; *School Trustees v. Stocker,* 42 N. J. Law, 115; *Hawes v. Contra Costa W. Co.* 5 Sawy. 287, Fed. Cas. No. 6,235; *Porter v. Lee,* 88 Tenn. 782, 14 S. W. 218; *State ex rel. Bailey v. Brookhart,* 113 Iowa, 250, 84 N. W. 1064; *Railroad Cos. v. Schutte,* 103 U. S. 118, 143; Wells, Res Adjudicata, § 217. The citations are to this effect:

"Where several points are decided any of which would determine the case, the conclusion upon none can be rejected as *obiter* because it was not necessary to the result."

"Where several points are presented and decided, the conclusions as to none can be said to be *obiter* because another

point was found which really dominated the whole situation and disposed of the case."

"Though a question was not fully argued, the decision thereof is not *obiter*, if it was fairly involved in the case, and the judicial mind was fairly drawn thereto and expressed upon the subject."

"When a principle is declared in answer to a contention in the case and as a step in reaching the final result, not by way of mere argument or illustration, it is not to be regarded as *obiter dictum*. The manner in which it is applied to the case does not destroy its weight as an authoritative exposition of the law upon which the adjudication rests."

The idea that a decision on a point not necessary to the final result is to be regarded as *obiter* was thus characterized in *Kirby v. Boyette, supra:*

"The proposition upon which the contention . . . is based is unsound in law. . . . The theory is that if a court in the elucidation of the questions involved in any given controversy finds it necessary to crystallize the law upon the subject into a clean-cut rule, which will prove a guide to the profession," such rule is without force, "because the case in hand might have been decided by stating the principle governing the particular case instead of the broader one founded upon the reason of the thing but decisive also of other cases as well as that at bar.    To lend our sanction to such a view of the law would be to imperil the security of many principles upon which titles have been acquired under the advice of the most competent counsel.    A due regard for vested rights necessarily constrains a court to reject such a theory as little short of revolutionary."

Quite as emphatic as that is the language of WAITE, C. J., in *Railroad Cos. v. Schutte, supra,* part of which is quoted above, followed by this:

"Here the precise question was properly presented, fully argued, and elaborately considered in the opinion. The decision on this question was as much a part of the judgment of the court as was that on any other of the several matters on which the case as a whole depended."

The application of these citations to *Brown v. Phillips,* 71 Wis. 239, 36 N. W. 242, will later become clear.

The cited authorities cover the subject of *res adjudicata,* the force of the rule of *stare decisis* as a law of property, and such rule in its broader sense as well, all applying to the question in hand. A matter of law so judicially declared as to be binding upon parties to the action in which the declaration is made and their privies, under the doctrine of *res adjudi-cata,* if it pertains to property and is sanctioned, so to speak, by lapse of time, is binding upon all under the doctrine of *stare decisis,* as a rule of property, and if it does not fall within such rule it is to be regarded nevertheless as having such stability as not to give way to judicial action except upon some seemingly overpowering necessity. The doctrine is voiced by text-writers thus:

"The certainty of a rule is often more important than the reason of it; the maxim *Stare decisis, et non quieta movere* is a safe judicial policy and should be adhered to. If the law as heretofore pronounced by the court in giving construction to the statute ought not to stand, it is in the power of the legislature to amend it without impairing rights under it."

The importance of the doctrine thus declared cannot be overestimated. To depart from it by regarding the conclusions reached, as to all questions of law in every case that might have been passed without affecting the final result, as mere *obiter dicta,* "loose sayings; words spoken by the bye, or on the spur of the occasion," as the writers define the term, or, in other words, without force as to future litigation, would result in the most unfortunate confusion in the administration of justice.

The view of courts generally on this subject is not better expressed anywhere than in *Palmer's Adm'rs v. Mead,* 7 Conn. 149, in these words:

"There is not in the common law a maxim more eminently just, and promotive of the public convenience, than that of

*stare decisis.* . . . If law well established may be annulled,. by an opinion, a foundation is laid for the most restless instability. . . . No system of inflexible adherence to established law can be as pernicious as . . . ceaseless and interminable fluctuations."

A pretty full discussion of the subject of what respect should be paid to decisions of the character above indicated, is found in *Buchner v. C., M. & N. W. R. Co.* 60 Wis. 264,. 19 N. W. 56. There the rigorous rule as to what constitutes. *obiter,* seemingly applied here to the decision in *Brown v. Phillips,* 71 Wis. 239, 36 N. W. 242, and which seems to be necessary from the standpoint of the court to avoid the effect of it, in an opinion by the present chief justice, was most emphatically repudiated, and the view there expressed has since been repeatedly indorsed here and elsewhere. The case will be found frequently cited in the text-books and the decisions of other states as an authority to be followed.

The application of the doctrine so declared and indorsed is. not more strikingly illustrated than by the history of *Dodge v. Williams,* 46 Wis. 70, 1 N. W. 92, 50 N. W. 1103. There four points were decided, any one of which was a legitimate basis for the final result. One of them was not argued at length by counsel, nor treated extensively in the opinion of the court. In a brief paragraph it was referred to by the learned chief justice who wrote the opinion, and pointedly decided. Thereafter, from time to time, what was said in respect to the matter was argumentatively mentioned by individual judges as *obiter,* but the court did not venture to overrule it. Some eighteen years after the date of the decision, it was, by a divided court, recognized as authority. *Harrington v. Pier,*. 105 Wis. 485, 82 N. W. 345. Somewhat later, upon a cause being presented where the point involved was vital to the result, such decision was held to be a judicial rule and so. firmly established in our judicial system, being a rule of property, that only the legislature could properly change it.

*Becker v. Chester,* 115 Wis. 90, 91 N. W. 87, 650. Still
later that same point so referred to for over eighteen years as
*obiter,* was given the dignity of having been the one of pri-
mary importance when it was first passed upon. *Danforth v.
Oshkosh,* 119 Wis. 262, 97 N. W. 258.

In view of the foregoing and many other illustrations of a
similar character that might be given, it seems a mistake for
the court to say, in effect, that a decision, as a judicial rule,
goes really no further than the mandate: the decision of the
ultimate question in the case, or questions essential to the
final result. If that were correct, the major part of every
legal opinion would be *obiter.* There would be very little use
for writing legal opinions and preserving them as precedents.
All that would be useful would be a statement of the facts
and the decision. That is the view expressed by the present
chief justice in *Buchner v. C., M. & N. W. R. Co., supra.*
In treating one of the underlying questions in the case, he
said that if the extreme rule as to what constitutes *obiter* were
to prevail, what he was then saying should be so characterized
whenever subsequently referred to for authority in the deci-
sion of a case.

From the foregoing it would seem—when the court in de-
ciding a case meets one of its recorded conclusions in some
prior litigation, which was reached as one among other steps
in approaching the final result that might, however, have been
attained without taking that particular step, but which if to
be followed is presently controlling, though in the light of the
particular investigation produced by the new situation it ap-
pears to be wrong and not so firmly intrenched but what it
may properly yield—that the more orderly way to solve the
difficulty is to face the matter squarely, confess the error, and
rectify it, rather than avoid it by the easy method of saying
that it was not necessary to the former decision and hence is
to be disregarded. This court has, it is believed, made few
departures from such better way. To those few, I venture to

say, it has added one in the decision from which I now dissent.

So we have now here for consideration only a cold question of law. Warm it all we may with beautiful expressions as to the broad field of woman's influence, and her disposition to fully occupy it; illuminate it all we can by the light of right public policy, it remains a question of law still, not one as to what the law ought to be, or what we would have it to be, but of what it in fact is, as voiced by the lawmaking power and declared by this court. I would not willingly yield to any one in thought or expression or deed in paying tribute to the capacity and disposition and accomplishments of woman in moulding the destinies of children. I could sit, as it were, at the feet of motherhood in supreme satisfaction and veneration, singing praises before the mind's personification of its beauty and grandeur and usefulness, towering above all other things in preparing the young to cope successfully in the activities of life. But however much I may think womankind should be allowed and in fact should participate in governmental affairs "pertaining to school matters," I must face the stern fact that courts do not make the law; they only declare it as they find it. In that I do not intend to suggest want of appreciation of that situation by others: to claim the slightest superiority in that regard for myself. It is only to emphasize the point of view from which I take my observation of the written and the unwritten law on the subject in hand.

The written law is as follows:

"Every woman who is a citizen of this state, of the age of twenty-one years or upwards, . . . who has resided within the state one year and in the election district where she offers to vote ten days next preceding any *election pertaining to school matters* shall have a right to vote at *such election.*"

The difficulty now is in respect to the meaning of the term "election pertaining to school matters." We shall not take

time to carefully analyze it. It goes without saying, it seems, that generally speaking the word "election" applies to the choice of officers, not the mere expression of approval or disapproval in respect to a referendum proposition. True, in its broad general sense it includes all acts of choosing between individuals or alternatives; but what does it mean in the act in question? The literal sense of the word, ordinarily, in legal enactments relates to choice of persons for public office by voting; the exercise of the right of suffrage. In the constitution it is used over and over again and not in one instance, so far as we can discover, in any other sense than the one indicated. When a referendum is provided for and the time for submission is not confined to that of a choice of officers, the term "election" is not used. When it is so confined, the idea of submitting the matter to a vote is spoken of as something distinct from the election itself; it is provided that it shall or may occur at the election. In sec. 5, art. XI, of the constitution, provision is made for submitting questions relating to banks at any general election, the result to be declared, not solely with reference to the vote cast in favor of the proposition, but to that and the vote cast at such election, referring to the election of officers. In sec. 1, art. XII, of the constitution, providing for submitting to a vote of the electors a proposed amendment to the constitution, the term "election" is not used, as the legislature is left free to submit such matter at an election or not in its discretion. The term is used in the same way in statutes, though with here and there an exception. That would lead, it would seem, very naturally to the belief that the legislature did not depart from that idea in the instance in question; that in using the term "election pertaining to school matters" they had in mind only election of officers, not an occurrence of voting on every subject pertaining directly or indirectly to the management or maintenance of schools that might be passed upon at the polls.

The most that is claimed for the word "election" by those uniting in the decision from which I dissent is that the term as used is open to construction, and that its real meaning is as held.   I do not think it is so very clear that it is so open. If we grant that it is, however, then we have in favor of the literal sense the particular construction that has been given thereto for some twenty years.   The law was passed in 1885. From that time to the instance in question no one seems to have supposed that it related to anything other than choice of officers.   Is it not strange, if the legislature in submitting the matter to a vote of the people, and the latter in favoring it, supposed it related to voting upon every question that might be submitted to the electors, that the right was never exercised as now claimed until the exigency therefor arrived as to the particular matter in question in the city of *Madison?*

As proof further that no such broad meaning was intended for the term by the legislature, there is the fact that in the revision of the Statutes by Sanborn & Berryman in 1889, the law of 1885 was incorporated as we now find it, in connection with an explanatory note to the effect that it was not intended to afford women the unlimited right of voting at elections pertaining to school matters, and that "election," therein, refers to choice of school officers, citing the decision of this court in *Brown v. Phillips,* 71 Wis. 239, 36 N. W. 242, made shortly after the law was enacted, and then fresh in the minds of the revisers, the decision having been made during the process of their work.   Manifestly they framed the explanatory note in accordance with their and the common understanding of the law as then declared.   They used substantially the language of this court, doubtless observing the headnote to the case prepared by the official reporter containing these words: "An election pertaining to school matters . . . is an election for the choosing of school officers or school employees."

We further point to the well-nigh, if not quite, conclusive

indication of a legislative construction in the fact that the
law with the explanation of its meaning aforesaid and the de-
cision of this court with the official reporter's characterization
of the point decided therein, were brought sharply to the at-
tention of the legislature in 1898, at the time of the last re-
vision, without any attempt being made to change it, or to
modify the annotation. True, the adoption of the revision
did not adopt such annotation; yet such adoption, under the
circumstances, without the revisers' attention being called to
any error in the latter so as to lead to a change thereof, if
one were necessary, affords strong proof of legislative recogni-
tion of the law as meaning what the annotation indicates.
That condition remained undisturbed down to the occasion
in question, rendering the decision of *Brown v. Phillips,
supra,* which we will now speak of more particularly, about
as forcible under the rule of *stare decisis* as one could well be.

In the case referred to, this court was brought face to face
with the subject of determining the meaning of the term un-
der discussion. True, the particular question involved was
whether an election "pertaining to school matters" included
the election of city officers generally having to do with such
matters in the remote sense of choosing members of the school
board and approving of contracts relating to schools, but it
was assumed, as the history of the case bears unmistakable
indications, that the point presented called for a construction
of the term under consideration, not in part, but in the whole.
An examination of the briefs of counsel, preserved in the
state library, discloses that the case was presented at the bar
in the broad aspect suggested. Counsel for the respondent
contended for the correctness of the broadest meaning that
could be taken of the law. They insisted that the legislature
intended to extend to women the privilege of participating in
all that concerns the interest and welfare of the schools.
Counsel for the appellant contended that the intent, at the
most, went no further than to give to women the right to vote

at the election of officers having to do with the immediate management of the schools. In dealing with the subject the court demonstrated, historically, that from first to last the thought in the legislative mind, in formulating the enactment, was participation of women in the election of school officers. In closing the subject in the opinion, this plain language was used:

"Such right to vote is only given at an 'election pertaining' or relating 'to school matters.' . . . What are we to understand by the word 'election' as thus qualified? When standing alone it is defined as 'the act of choosing; choice; the act of selecting one or more from others.' . . . *Such qualified 'election,' therefore, must mean 'the act of choosing a person to fill an office or employment'* in 'school matters.' . . . An election for the choosing of any school officers or school employees would be an 'election pertaining to school matters.' "

The whole trend of the opinion seems to indicate that the idea of the term "election" having been used in any other sense than that of choosing officers or employees was not entertained by the court for an instant. Such being the case, it is not to be wondered at that the revisers, while the decision was fresh in mind, formulated the explanatory note heretofore referred to, in harmony therewith.

What has been said sufficiently shows from my standpoint that the conclusion reached by the court is wrong. We might rest the matter without going further. Turning however to sec. 943, Stats. 1898, as amended by ch. 312, Laws of 1903, under which the proceeding giving rise to this litigation was had, we are unable to find any warrant therein for participation by women in deciding the bond proposition at the polls. The law referred to, so far as necessary to have it in view in this discussion, is as follows:

"Unless it is otherwise provided by law, no . . . city . . . shall issue any bonds . . . unless upon compliance with the following conditions: Whenever a . . . common council shall declare its purpose to raise money by issuing bonds, it shall

direct, by resolution, which shall be recorded at length in the record of its proceedings, the . . . city . . . clerk to call a special election for the purpose of submitting the question of bonding the . . . city . . . to the electors thereof. . . . Such election shall be held at the usual place or places of holding elections, unless the . . . common council shall in the resolution . . . designate some other place or places. . . ., Provided . . . that when any such special election is held at the same time as a regular . . . city . . . election, then such form of ballot . . . may be printed upon the official ballot to be voted at such election. . . . Provided, however, that the provisions of this section shall not apply to the issuing of bonds by any city of this state for . . . school purposes . . . unless within thirty days after the passage by the common council of the city of a resolution or ordinance authorizing the issuing of bonds for such purposes there shall be filed in the office of the city clerk a petition in writing *signed by not less than ten per cent. in number of the voters who voted in said city at the last general state election,* asking for a submission of the question of issuing such bonds to a vote of the people."

By my brethren, subject to a query to which some attention will be given later, it is conceded that unless the term "electors thereof" in the enactment includes women they improperly voted on the occasion in question, even if the limited right of suffrage granted to women is as broad as respondents' counsel contends and the court holds. In determining the meaning of such term we make but little progress by considering its general scope. That its ordinary signification is, a person having a constitutional right to vote at elections, generally, of public officers, needs no discussion. True, in its broad sense it includes all persons who have a constitutional right to vote on any proposition submitted to the public for an expression of their choice. The question for us to solve, however, is what is its meaning in the law under consideration. The first rule of construction to be applied, as before indicated, if the law is open to construction at all, is that it must be presumed that the legislature used the term according to

the meaning generally ascribed to it. That would not include those having a mere limited right of suffrage, one not extending to elections generally. Is there anything in the law indicating that the legislature used the term in a different sense? They could not have used it at the outset with reference to the limited right of suffrage conferred upon women, because whereas such right originated in the law of 1885, the law in question originated in 1872. That is proof conclusive, it would seem, that none but persons having the full right of suffrage were thought of by the original framers. That is strikingly significant of the legislative purpose. It is provided that in case the bonding proposition is voted on at a regular city election, the ballot may be part of the general official form. That feature was added to the law of 1903 two years after the enactment of ch. 285, Laws of 1901, providing separate ballot boxes for women. Comparing those two laws, it is seen that the later expression of the legislature does not include the thought that women are to vote on a bonding proposition. Under the law of 1901 they are not to use the ballot boxes or ballots provided for general elections. Under the act of 1903 no ballot is contemplated except those proper for the use of persons having the full right of suffrage.

The most convincing feature of the act of 1903 in support of our contention is the proviso that the bonding proposition is to be submitted to a vote of the electors, only upon condition of a petition therefor in writing being filed with the city clerk signed by not less than ten per cent. in number of the voters who voted in the municipality in the last general state election. Can there be any doubt but what the *persons* competent to petition are the *persons* to whom the proposition is required to be submitted? No one can belong to the former who did not vote in the municipality at the previous general state election; no one could have done so without possessing the full right of suffrage. Women do not possess such right;

therefore they cannot be counted as petitioners under the act. We see no way of escaping that logic. I understand counsel for respondent to have conceded *that* on the oral argument, and to have failed to respond readily, if at all, to a request for some logical reason for saying a person not competent to petition for submission of the bonding matter to vote of the electors may yet be regarded as an elector for the purpose of voting thereon. We hoped the court would treat what counsel seem so significantly to have failed in. In that we are disappointed. It is said the circumstance that only electors, in the sense of full suffragists, are competent to petition for submission of the bonding proposition "has no material or persuasive bearing. It does not indicate any intention by the legislature to deny to any constitutional elector his right to vote at the election which might be rendered necessary by the filing of the petition." Why it is not material or persuasive as to the legislative intention the opinion is entirely silent. On that we have mere naked judicial assertion. I must assume that the explanation of that is the difficulty of assigning any logical reason: the same difficulty that the learned counsel for respondents experienced on the oral argument. I make no claim that it indicates a legislative intention to deny to any constitutional elector his right to vote. The claim is that women are not constitutional electors, except in a very limited sense, and that they were not in the legislative mind in framing the act in question.

Now it would seem very plain that when the law says that a proposition shall be submitted to the electors for their decision upon a petition being made therefor by ten per cent. of the electors who voted at the last previous state election, and that is what the law in question obviously says about as plainly as words could express a matter, electors at the initiative, by necessary implication, must be the same as electors to make the choice. To say that the former must be full

·suffragists and the latter need not be, to my mind is highly illogical: is to place by arbitrary construction an element in the statute not placed there by the legislature.

I see materiality and persuasiveness to a high degree in the ·circumstance that only full suffragists are competent under the law to petition for submission of the bonding scheme. I ·see that because of the seeming unreasonableness in the idea ·that one may be an elector for the purpose of voting on the ·bonding proposition, and not for the purpose of petitioning for submission thereof to the electors. To my mind such ·circumstance indicates the legislative intent, because the class denominated electors are so tied with that denominated voters ·who may petition, as to show with all the certainty of express declaration that one is synonymous with the other. The confession that members of that one class only can properly petition for the referendum is tantamount to a confession that only members of that one class can participate in responding by voting on the proposition. The one follows the other, to my mind, by irresistible logic.

Now a word about the query of my brethren as to whether ·the legislature has power to provide for an election at which only a certain part of the electors recognized by the constitution shall be allowed to vote. I am a little at a loss to see ·the bearing of that. Perhaps since my brethren went no further than to venture the query, I should pass the matter unnoticed, but I will treat it briefly. The constitution does not recognize women as voters except in a very limited sense at "elections pertaining to· school matters." As such elections ·concern, if I am right, only the choice of school officers, the court's query is entirely outside the case. If it be referable to sec. 943 as amended by the act of 1903, in connection with the assumption that the issuance of municipal bonds pertains to school matters, then there is no great doubt of authority that it is competent for the legislature to limit the right to ·vote in municipalities as to their mere local matters, relating

to the imposition of public burdens and the regulation of property, to those having special qualifications, in the absence of any constitutional prohibition in that regard. On this the following are in point: *McGraw v. Greene Co.* 89 Ala. 407, 8 South. 852; *Murdock v. Weimer,* 55 Ill. App. 527; *Scott v. Twombly,* 20 Misc. (N. Y.) 652, 46 N. Y. Supp. 1084; *State v. Woodruff,* 2 Day, 504; *Hanna v. Young,* 84 Md. 179, 35 Atl. 674. In the last case cited the constitutional feature was particularly considered and passed upon. *State v. Williams,* 5 Wis. 308, is not inconsistent therewith.

There are other cogent and important reasons for the position I maintain. However, since those already given at length seem amply sufficient to justify my dissent from the decision of the court, I will not further discuss the case.

KERWIN, J. I concur in the foregoing opinion of Mr. Justice MARSHALL.