## Stuessy v. City of Louisville, et al.

(Decided December 19, 1913).

Appeal from Jefferson Circuit Court
(Chancery Branch, Second Division).

1. Elections—Act Enabling Women to Vote At School Elections—
"School Improvement Bonds."—Under the Act of March 12, 1912, enabling women to vote at all elections of school trustees and other school officers required to be elected by the people, and upon all school measures or questions submitted to a vote of the people, women have the right to vote upon a proposition for a city of the first class to issue "School Improvement Bonds."

2. Elections—Act Enabling Women to Vote at School Elections.—
An election upon a proposition of issuing school bonds is a school measure or question within the meaning of the Act of March 12, 1912, enabling women to vote at all elections upon all school measures or questions submitted to a vote of the people.

3. Elections—Time and Place of Holding—Notice.—The time and place of holding regular elections are generally prescribed by public laws, and when this is so the rule is, that an omission to give the prescribed statutory notice will not vitiate an election held at the time and place appointed by law.

4. Elections—Submission of School Bond Issue—Ordinance—Notice.
—Where a statute authorized the submission of a school bond issue to the vote of the people by an ordinance of the municipality, and did not prescribe any notice to be given of the election so authorized and called, the failure of the Mayor to give a notice prescribed by the ordinance did not invalidate the election.

5. Elections—Submission of School Bond Issue—Ordinance—Notice.
—Where an Act of the Legislature provides that a city council may submit the question of a school bond issue to the vote of

the people at the next regular municipal election, without requiring any notice of the election to be given, the submission of that question by an ordinance duly adopted, constitutes all the notice that is necessary to a legal submission of the question, provided sufficient time · elapses between the adoption of the ordinance and the election to afford the voters a reasonable opportunity of informing themselves upon the merits of the question submitted.

ROBERT F. VAUGHAN for appellant.

PENDLETON C. BECKLEY for appellee City of Louisville, et al.

BEN S. WASHER and ARTHUR M. RUTLEDGE for appellee, Board of Education.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

The appellant, a taxpayer, instituted this action to enjoin the city of Louisville, a city of the first class, and John H. Buschmeyer, its mayor, from executing, issuing or delivering "School Improvement Bonds" of the city of Louisville of the face value of one million dollars, which were authorized by the voters of the city at the election held November 4, 1913.

The circuit court sustained a demurrer to the petition, and the plaintiff having declined to further plead, the petition was dismissed, and the plaintiff appeals.

The appeal presents questions of law only; there is no dispute whatever about the facts.

If all the steps required by law for the issuing of the bonds have been taken, they will be valid and the petition was properly dismissed; if, however, any essential requirement has been omitted, the bonds cannot be lawfully issued, and their execution should be restrained.

The Act of the legislature, approved March 4, 1910, makes every city of the first class, in this State, a single school district, and provides that the supervision and government of common schools, kindergartens, high schools, manual training schools and normal schools, and all such school property therein, shall be vested in a board of five members to be known as the Board of Education of said city. Acts 1910, page 2.

It is proposed to issue these bonds by virtue of the authority of an act of the legislature, approved March 15, 1912, entitled "An Act to Amend the School Laws of Cities of the First Class," which provides:

"That in cities of the first class whenever the Board of Education shall deem it necessary for the proper accommodation of the schools of such city to purchase a site or sites or to erect school houses for the high schools or for the other schools, or to purchase land for the enlargement of existing school yards, or for any or all these purposes, and the annual funds raised from other sources are not sufficient to accomplish said purpose or purposes, and it shall deem a bond issue to be necessary therefor, said board shall make a careful estimate of the probable amount of money required for such purpose or purposes, and it shall certify to the General Council of said city the fact that an election for an issue of bonds for school improvements should be held together with the amount of money for which bonds shall be issued and the purpose or purposes to which the proceeds thereof shall be applied. It shall thereupon be the duty of the General Council to adopt an ordinance submitting to the qualified voters of the city at the next regular municipal election the question whether bonds of the city to the amount specified shall be issued for school improvement purposes. The bonds so issued shall be designated as 'School Improvement Bonds,' and the ordinance shall provide the date and maturity of such bonds, the rate of interest they shall bear, and the total amount to be issued; and the ordinance shall also contain the necessary details in reference to the execution and delivery of said bonds, their denominations, coupons to be annexed, tax to be levied to pay the interest and a sinking fund to retire such bonds at maturity. No bond issue shall ever be for an amount exceeding the sum of one million dollars. The question to be submitted shall be so framed that the voter may by his vote answer for or against the issue of bonds.

"It shall be the duty of the mayor of the city to see to it that all proper steps are taken to secure a vote of the people upon the question, conforming, as far as applicable, to the proceedings in case of an election for members of the Board of Education in cities of the first class. If the voters of the city shall determine that such bonds shall be issued, they shall, when so issued, be placed under the control of the Board of Education, who shall determine when and at what price and how they shall be sold:

"Provided, That no such bonds shall be sold for less than par; and, provided, further, That any premium

which may be obtained from said bonds shall constitute a part of the sinking fund for their ultimate retirement. As the bonds are sold, their proceeds shall be placed to the credit of the board in the same depositories which are selected for its other funds, but shall be kept in a separate account and shall be used only for the purpose for which the bonds were issued.

"It shall be the duty of the General Council to levy annually in its tax levy a rate that will raise a sum that shall be sufficient to pay the interest and create a sinking fund for the payment of the bonds at maturity. The said bonds, principal and interest shall be a charge upon the sinking fund of said city, and it shall be entitled to have the annual tax that shall be levied as aforesaid." Acts 1912, p. 257.

Proceeding under this act, the Board of Education of the city of Louisville adopted a resolution on June 3, 1913, declaring that it deemed a bond issue for one million dollars necessary for school purposes, as authorized by the act; and having made a careful estimate of the probable amount of money required for said purposes, it certified to the General Council of said city the fact that an election for the issue of bonds for one million dollars for school improvements should be held in said city, and the specific purposes for which the proceeds of said bonds would be applied. Thereafter, in August, 1913, and pursuant to the direction of the act of March 15, 1912, above set out, the General Council adopted an ordinance submitting to the qualified voters of said city, at the next regular municipal election, to be held in said city on November 4, 1913, the question whether the bonds of the city of Louisville, to the amount of one million dollars, should be issued for "School Improvement Purposes," to be designated as "School Improvement Bonds." Said ordinance was duly approved by the Mayor on August 8, 1913; was thereafter duly published as required by law, and became effective on August 12, 1913.

The question thus submitted and certified to the people was voted upon at the regular November election of 1913; and of the 32,772 voters voting upon that question, 22,259 voted for the proposition and in favor of the issuance of said bonds, and 10,513 were cast against the proposition. The result of the election was properly and regularly certified by the election commissioners of the county to the county court clerk. It will thus be

seen that the bond proposition received the requisite assent of more than two-thirds of the voters who voted upon that proposition at said election, as required by section 157 of the Constitution.

Three grounds are assigned for a reversal of the judgment of the circuit court: (1) that a large number of women voted in said election and upon said question, and that women are not entitled to vote in an election of this character under the law of Kentucky; (2) that the right to vote for school trustees and on all school measures and questions, conferred upon women by the act of March 12, 1912 (Acts 1912, p. 193), does not include the right to vote on a bond issue; and (3) that the ten days' notice of the submission of the proposition provided by the ordinance, was not given.

We will consider these questions in the order named.

1. Excluding the exceptions, which do not embrace women, the right to vote in Kentucky is fixed by section 145 of the Constitution, which reads as follows:

"Every male citizen of the United States of the age of twenty-one, who has resided in the State one year, and in the county six months, and in the precinct in which he offers to vote sixty days next preceding the election, shall be a voter in said precinct, and not elsewhere."

Section 155 of the Constitution further provides:

"The provisions of sections 145 to 154, inclusive, shall not apply to the election of school trustees and other common school district elections. Said elections shall be regulated by the General Assembly, except as otherwise provided in this Constitution."

Acting under section 155, above quoted, the legislature, by the first section of an act approved March 12, 1912, provided:

"That all women possessing the legal qualifications required of male voters in any common school election, and who in addition are able to read and write, shall be qualified and entitled to vote at all elections of school trustees and other school officers required to be elected by the people, and upon all school measures or questions submitted to a vote of the people; and all women possessing the legal qualifications required as to males shall be eligible to hold any school office or office pertaining to the management of schools. *Provided,* how-

ever, that this .act shall not apply to any election the qualifications of the voters at which are otherwise prescribed by the Constitution nor to any office as to which the Constitution otherwise prescribes the qualifications of the persons eligible thereto." (Acts 1912, page 193.), The act is copied in full in 155 Ky., 306.

It is contended that the right given by section 155 of the Constitution to the General Assembly must be strictly confined to "the election of school trustees and other common school district elections," and, that when the legislature by the act of March 12, 1912, extended the right of suffrage to women "upon all school measures or questions," it exceeded its authority and went beyond the limits imposed by the Constitution, since under said act women are authorized to vote for officers other than school trustees, and at elections other than common school district elections.

In Crook v. Bartlett, 155 Ky., 305, we considered, at some length, the effect of the act of 1912, extending the right to vote to women on school questions, and held that it constitutionally gave the right to women to vote in the election of a county school superintendent, thus holding that an election of that character was a school measure or question within the meaning of the act, although section 155 of the Constitution. did not mention county superintendent of common schools, or any other school officers except school trustees. It was there further held that the words "other common school district elections," found in section 155 of the Constitution, were broad enough to embrace elections for county superintendent of common schools. In so holding, we said:

"A narrow construction of these words would confine them to elections relating to taxation for school purposes, or other elections concerning schools that did not involve the election of school officers, independent of school trustees, and would further confine them to 'common school district elections,' as distinguished from common school county elections. But no sufficient reason appears for giving to these words this limited meaning. On the contrary, the words 'other common school district elections' refer to all elections that have to do with matters relating exclusively to the management and conduct of the affairs of the common schools of the State, saving the office of Superintendent of Public Instruction, which is a constitutional office. Section

155 of the Constitution was evidently intended to take all school elections out of the provisions of the article on suffrage and elections and put these elections in a class by themselves, to be controlled by the will of the General Assembly of the State."

Again, in speaking of section 155 of the Constitution, the court, on page 311, *supra,* used this language:

"In excepting school officers and school elections from the general provisions relating to elections, the framers of the Constitution had in view the large purpose of putting all common school elections in a class by themselves, and this manifest purpose should not be frustrated by attaching undue importance to particular words, or by giving to them a meaning that would defeat the intention of section 155 when considered as a whole.

"This section should be given a liberal construction and one that will carry out what seemed to be the purpose of its enactment, which was to leave the legislature a free hand in everything relating to the management and control of the common schools of the State except when restrained by other sections of the Constitution."

Under this broad construction of section 155 of the Constitution, whereby a free hand is given to the legislature in everything relating to the management and control of the common schools of the State, we see no difficulty as to the power of the legislature in passing the act of March 12, 1912, by which it gave the franchise to women "upon all school measures and questions submitted to a vote of the people." The city of Louisville being a school district, an election therein upon a tax measure is clearly a "school district election" within the exception of section 155 of the Constitution, over which the legislature is given control.

2. It is suggested, however, that an election in regard to the issuing of school bonds was a municipal or political question, and not a "school measure or question" within the meaning of the act of March 12, 1912. That the voting upon the question constituted an "election" within the meaning of that term as used in the Constitution there can be no doubt. Morgan v. Goode, 151 Ky., 284; Hall v. City of Madison, 128 Wis., 132. And, in view of the interpretation given to the term "elections" as found in section 155 of the Constitution,

in Crook v. Bartlett, *supra,* there can be no doubt that the election upon the question of issuing school bonds is a "school measure or question," pure and simple. It not only vitally affects the management and control of the common schools of the city, but the act under which the election was held expressly provides that the proceeds of the bonds authorized under said election are to be applied to school purposes only. The bonds are to be entitled "School Improvement Bonds," and were voted for under an act entitled "An Act to Amend the School Laws of Cities of the First Class."

Furthermore, these bonds were voted for in pursuance to the resolution of the Board of Education, and the question of issuing them could not have been submitted to the people without that having been first done.

The Board of Education in cities of the first class has no authority to issue school bonds, or levy a tax for school purposes. That power rests exclusively in the General Council. And, in City of Louisville v. Commonwealth, 134 Ky., 488, the Board of Education compelled the city and its Mayor, by mandamus, to levy a school tax which had been provided by an act of the legislature. In the course of that opinion, we said:

"Nor does the State take its hands off the control of the school system, by allowing, or by requiring, the different localities to take steps toward supplementing the general appropriation by local taxation. The school is none the less a State institution for that matter."

And, in the same opinion, it was expressly said that the public schools were not municipal institutions at all; on the contrary, they are a part of the State's common school system, and their trustees are officers of the State.

And, in the late case of the City of Louisville v. Board of Education, 154 Ky., 316, we further said:

"This question is no longer an open one in this State. We have several times written in substance and effect that every common school in the State, whether it be located in a populous city or in a sparsely settled rural district, is a State institution, protected, controlled and regulated by the State, and that the fact that the State has appointed agencies such as fiscal courts, school trustees and municipal bodies to aid it in the collection of taxes for the maintenance of these schools, does not deprive them of their State character. City of Louis-

ville v. Commonwealth, 134 Ky., 488; Prowse v. Board
of Education, 134 Ky., 365; Elliott v. Garner, 140 Ky.,
157; Board of Education v. Townsend, 140 Ky., 248;
McIntire v. Powell, 137 Ky., 477; City of Henderson
v. Lambert, 8 Bush, 607; Bamberger, Bloom & Co. v.
City of Louisville, 82 Ky., 337.

"Therefore, when a municipal body, or a county,
or a school district levies taxes for school purposes, the
tax so levied is a State and not a municipal, county or
district tax, although it be levied and collected by mu-
nicipal or county or district officers.  The fact that the
tax is levied and collected for the State by these agen-
cies of the State appointed for that purpose does not de-
prive it of its character as a State tax."

If the issuance of these bonds is not a school meas-
ure or question, it is hard to imagine a case that would
come within the meaning of those terms.  Crook v.
Bartlett, *supra.*

3.  Did the failure to give the full ten days' notice
required by the ordinance invalidate the election?

The petition alleges, and the demurrer admits, that
only five days' notice of the election was given; while
section 6 of the ordinance of August 8, 1913, submitting
the question, provides as follows:

"Separate ballots shall be prepared for the purpose
of ascertaining the will of the qualified voters at the
general election on November 4, 1913, upon which bal-
lots there shall be printed the following question or
proposition required to be submitted to the qualified
voters of the City of Louisville by this ordinance, viz:
'Are you in favor of the issue by the City of Louisville
of one million ($1,000,000) dollars of "School Improve-
ment Bonds" to be used for school improvement pur-
poses, as provided in Ordinance No. —— Series 1913,
and the Act of the General Assembly of the Common-
wealth of Kentucky, entitled "An Act to Amend the
School Laws of Cities of the First Class," approved
March 15, 1912?'  Such ballots shall be deposited in sep-
arate ballot boxes, to be provided for this purpose by
the Sheriff of Jefferson County.  And the Mayor is
hereby authorized and directed to give public notice of
the time, place and purpose of the election upon said
question or proposition at least ten (10) days (exclusive
of Sundays) prior to the day of election, in each of the

daily morning and afternoon papers published in the
City of Louisville."

The general rule for the construction of statutes
regulating elections is laid down in 15 Cyc., 317, as fol-
lows:

"In the construction of statutes regulating elections
it is important to keep in mind two recognized princi-
ples:   (1) The legislative will is the supreme law under
the constitution, and the legislature may prescribe the
forms to be observed in the conduct of elections, and
provide that such method shall be exclusive of all others;
(2) since the first consideration of the state is to give
effect to the expressed will of the majority, it is directly
interested in having each voter cast a ballot in accord-
ance with the dictates of his individual judgment.

"Recognizing the principle first above stated, the
courts have uniformly held that when the statute ex-
pressly or by fair implication declares any act to be es-
sential to a valid election, or that an act shall be per-
formed in a given manner and in no other, such provis-
ions are mandatory and exclusive.

"By an application of the second principle above
stated the courts, in order to give effect to the will of
the majority, and to prevent a disfranchisement of legal
voters, have quite as uniformly held that those provis-
ions which are not essential to a fair election are merely
formal and directory."

And, on page 320 of the same volume, it is further
said:

"The time and place of holding regular elections are
generally prescribed by public laws, and when this is so,
the rule is that an omission  to  give  the  prescribed
statutory notice will not vitiate an election held at the
time and place appointed by law.  In such case the pro-
vision for notice is considered as directory and not man-
datory.  The time and place being appointed by law, the
electors are bound to take notice of the same and there-
fore derive notice from the statute itself, inasmuch as
they are presumed to know the law.  The purpose of the
prescribed notice is to give greater publicity to the elec-
tion, but the authority to hold it comes directly from the
statute; if it were otherwise any public election might
be defeated by the ignorance, carelessness, or design of
the officers whose duty it is to give the notice.  And *a
fortiori* a defective official notice which does not mis-

lead the electors or cause them to lose their votes will not vitiate a general election held under such circumstances; for where there has been a substantial compliance with the requirements of the law in this regard, and there has been a fair election, the result cannot be defeated by mere technical irregularities. The vital and essential question in all the cases is whether the want of a statutory notice has resulted in depriving a sufficient number of electors of the opportunity to exercise their franchise to change the result of the election."

It will be observed, however, that the notice in the case at bar is not required by the Constitution, or by the act of March 15, 1912, authorizing the submission of the questions; it is provided for by the ordinance only. It is true the act of March 15, 1912, above set forth, directs the Mayor to see that all proper steps are taken to secure a vote of the people upon the question submitted, conforming, as far as applicable, to the proceedings in case of an election of the members of the Board of Education in cities of the first class; but this provision of the act does not require the Mayor, or any person, to give notice of the election. On the contrary, the act makes it the duty of the General Council, upon its having received the certificate of the Board of Education, to adopt an ordinance submitting the bond question to the voters "at the next regular municipal election."

This was done by the 5th section of the ordinance, which reads as follows:

"That at the general election to be held on November 4, 1913, there shall be submitted to the qualified voters of the City of Louisville, as required by law, the question as to whether the city of Louisville shall issue bonds for the purposes aforesaid as provided for in this ordinance, and none of said bonds shall be prepared or issued unless at said election two-thirds (2-3) of those voting on the said question shall vote in favor of the issuance of said bonds, as provided for in this ordinance; but in the event it shall be duly ascertained and certified, as required by law, that two-thirds of those voting on said question at said election voted in favor of the issuance of said bonds for the purpose aforesaid, as provided for by said ordinance, the fact that they have done so shall be certified to by the Mayor upon the face of said bonds, which bonds shall then, and only in that event, be issued and delivered to and sold by the Board of Education of said City of Louisville, and the

proceeds of such sale applied and deposited as afore-said.''

The ordinance is styled "An Ordinance concerning the issuance of One Million Dollars of 'School Improvement Bonds' of the City of Louisville for the purpose of purchasing sites for school houses, the erection of school houses for the High Schools and other schools, and the purchase of lands 'for the enlargement of the existing school yards within said city' ''; and it was published in full in a daily newspaper of Louisville, in August, 1913, as required by law.

The ordinance fully complied with the statute, which made it the duty of the General Council to submit the question "to the qualified voters of the city at the next regular municipal election." The provision of the act making it the duty of the Mayor to take all proper steps "to secure a vote of the people upon the question" evidently intended to impose upon him the duty of co-operating with the General Council in the adoption of an ordinance submitting the question. This the Mayor did, promptly and efficiently, and in good faith. Suppose, however, the Mayor had declined to approve the ordinance; could he not have been compelled to approve it under the explicit language of this statute?

No specific notice being required by the statute or the Constitution, can it reasonably be contended that the ordinance should have gone further than the requirements of the Constitution or the statute by giving a specific notice in addition to the adoption of the ordinance which called the election? And if so, how much notice should it have given? Should it have given a different notice, or a longer notice than is required in the enactment of other city ordinances? If the ordinance in question had not required any notice, would any one doubt its validity under the facts of this case? And where the statute carefully prescribes what the General Council shall do in submitting the question, all of which is properly done, can the General Council invalidate the ordinance, which is otherwise valid, by incidentally inserting some extraneous provision in the ordinance? We think not. We must not overlook the fact that the ordinance properly and regularly called the election. The ordinance took its validity from the statute, and when it complied with the requirements of

the statute, and contained no provision contrary to the statute, it was a valid ordinance.

So, the question comes to this: Was the ordinance calling the election for a specific date, as was required by the enabling act, a sufficient notice of the election?

The question here presented was before the court in Board of Trustees of Augusta v. Maysville & B. S. R. Co., 97 Ky., 145, where the question of a bond issue by the city of Augusta was submitted to a vote of the people under an enabling act of the General Assembly, which did not prescribe the time, manner or place of holding the election, or the kind of notice to be given. The enabling act in that case is chapter 690 of the Acts of 1883-4, and merely provides for the issual of the bonds, provided a majority of the legal voters voting in said city should vote in favor thereof at an election called and held for that purpose. Acts 1883-4, vol. 1, p. 1270.

In that case, as here, a taxpayer sought to enjoin the city and its officers from issuing the bonds, and it was there also contended that notice of the election was necessary.

And, in the absence of such a requirement in the enabling act, it was further contended that the city council was bound by the manner of holding elections generally for the city, and that the same notice must be given as was provided by the city charter, which required a notice of thirty days. On the other hand, it was contended for the city that the ordinance calling the election under the statute was a notice of the election, and that no other notice was necessary.

In sustaining the election called in this way, the court said:

"It is also well settled that when the law fixes the time for holding an election, the notice otherwise required to be given may be dispensed with. Toney v. Harris, 85 Ky., 475; Berry v. McCulloch, 94 Ky., 247; Doores v. Varnon, 94 Ky., 507."

The effect of this decision is, that where the act of the legislature provides that a city council may submit the question of a bond issue to the vote of the people without specifying the kind of notice to be given, the submission of that question by an ordinance duly adopted constitutes all the notice that is necessary to a legal submission of the question, provided a sufficient

time elapses between the adoption and publication of the ordinance and the election to afford the voters a reasonable opportunity of informing themselves upon the merits of the question submitted.

If, however, the period between the publication of the ordinance and the election is of so short a duration as not to afford the voters a reasonable opportunity to so inform themselves, the publication of the ordinance will not be treated as a sufficient notice. In the case at bar the ordinance was published on August 8, 1913, about three months before the election was held. Certainly that was ample notice.

Furthermore, the size of the vote cast may be considered as evidence in determining whether the notice was sufficient, under the rule above announced. Wilson v. Brown, 109 Ky., 235. In the case at bar more than 32,000 votes were cast upon this proposition, while the total vote for mayor of the city in said election aggregated about 46,000 votes. Considering the fact that the vote on the bond proposition was taken by a separate ballot, the vote was, under all the circumstances, unusually large.

We conclude the election was not invalidated for want of the notice provided by the ordinance.

Judgment affirmed.