[No. 1750, April 20, 1915.]

KLUTTS et al. v. JONES, Treasurer, et al.

### SYLLABUS BY THE COURT.

1.   The authority and powers of officers are determined
by the law, considered as a whole, and a mistaken concep-
tion on the part of an officer as to the statute under which
he has acted will not affect the validity of his action, pro-
vided he actually had legal authority.   Held, that where di-
rectors of a school district, upon petition to the county su-
perintendent, were ordered by such officer to hold an elec-
tion for the purpose of determining whether the bonds of
such district should be issued for the purpose of providing
funds to pay for the erection of a new school building, such
action presumably being taken under chapter 46, Laws 1899,
which act did not apply to the election in question, because

such district had a school building, but where such directors had the power, under section 1542, Comp. Laws 1897, to call and hold the election in question, it will be presumed, nothing to the contrary appearing, that the directors acted under the latter section in calling an election for the purpose of determining whether bonds should be issued.

P. 235

2. A complaint, seeking to enjoin the issuance and sale of bonds authorized by the vote of the electors of a school district, which shows that the bonds were authorized by a majority of one vote, and that certain persons, naming them, voted for such bond issue, that such persons, at the time of the election, were not bona fide residents of the school district, and entitled to vote therein, and which contains other allegations showing that the votes cast by such persons changed the result of the election, is sufficient to withstand a demurrer.

P. 235

3. Where the Constitution of a state fixes the qualifications and determines who shall be deemed qualified voters in direct, positive, and affirmative terms, these qualifications cannot be added to by legislative enactment. **Held** that, the Constitution having made women possessing certain qualifications qualified electors at all school elections, that it would not be within the power of the Legislature to prescribe additional qualifications.     P. 241

4. An election within a school district for the purpose of determining whether bonds of such district shall be issued for the purpose of building a schoolhouse is a school election, within the meaning of section 1, art. 7, of the state Constitution.     P. 242

5. Section 1545, Comp. Laws 1897, construed, **Held**, that the boundaries of the school district need not be established and monumented prior to the holding of the election, or the signing of the bonds by the president of the school board.

P. 247

6.. The verb "to issue" means to emit or send forth, and it does not embrace the preliminary acts of calling and holding the election, or signing and dating the bonds, but is confined to the delivery, unless the context of the statute requires that a different meaning should be accorded to the words.

P. 247

7. The insufficiency of the affidavit or verification to a pleading is not ground for demurrer.

P. 249

8. The statutes of New Mexico contain no provision for contesting a school bond election.

P. 249

Appeal from District Court, Roosevelt County; McClure, Judge.

Action by William D. Klutts and another against Moses B. Jones, Treasurer, and another. From judgment for defendants, plaintiffs appeal. Reversed and remanded, with directions.

GEORGE L. REESE of Portales, for appellants.

Facts may be stated on information and belief as well as positively.
Sub-secs. 47 and 48, sec. 2685, C. L. 1897.

Bona fide residents of the school district were entitled to vote at the election.
Sec. 1, art. 7, Constitution of N. M.

To be a legal voter one must be a resident of the district.
C. 95, sec. 1, L. 1909.

The law will presume that the votes were legal until the contrary is alleged or shown.
15 Cyc. 416-17; 7 Enc. P. & P. 385.

Klutts v. Jones, 20 N. M. 230.

The complaint alleges a number of illegal votes were cast and demurrer should not have been sustained thereto.
4 Enc. P. & P. 607.

Plaintiffs were not required to anticipate a defense and negative it.
31 Cyc. 109.

The constitutional provision prescribing the qualifications of male voters lays down no qualifications for elections concerning the issuance of bonds for school districts.
State v. Dillon, 32 Fla. 545, 22 L. R. A. 124; Mayor of Val Verde v. Shattuck, 41 Am. S. R. (Col.) 208.

Women are not qualified voters upon the proposition of the issuing of bonds for a school district.
Seaman v. Baughman, 11 L. R. A. (Ia.) 354; Coggeshall v. Des Moines, 128 Am. S. R. (Ia.) 221; Commonwealth v. Steele, 97 Ky. 27, 29 S. W. 855; Thornton v. Terr., 17 Pac. (Wash.) 896; Menton v. Cook, 111 N. W. (Mich.) 94; Oppegaard v. Bd. County Comms., 43 L. R. A. (N. S.) (Minn.) 936; Slingerland v. Norton, 59 Minn. 351, 61 N. W. 322.

Issued means executed in some circumstances, while again in other circumstances it means delivered. It was the intention of sec. 1547, C. L. 1897, to require all preliminary matters, such as the establishing of boundaries, to be had before the election.

Defects in verification of pleadings can be reached only by motion.
31 Cyc. 285.

There is no remedy prescribed to contest this sort of an election.
22 Cyc. 883; 22 Cyc. 894; 36 L. R. A. (N. S.) 16; Fabro v. Town of Gallup, 103 Pac. (N. M.) 271.

Court may review qualifications of petitioners signing the petition.
35 Cyc. 992, 990.

As to rules to be observed in testing complaint, see 31 Cyc. 101.

JAMES A. HALL of Portales, for appellees.

The verification on information and belief is · insufficient.

129 Pac. (Okla.) 46, 47; Schanholtzer v. Thomson, 103 Pac. (Okla.) 595; Pelegrinelli v. McCloud River Lbr. Co., 82 Pac. (Cal.) 695; 22 Cyc. 944, 926.

Where bonds have been issued under authority the qualifications of voters at the election or persons signing the petition will not be inquired into by the court.

35 Cyc. 992; State v. School Dist., 13 Nebr. 82, 12 N. W. 812; Orchard v. School Dist., 14 Nebr. 398, 15 N. W. 730.

The burden is on plaintiff to allege that the majority he would have received would have been legal votes.

Wade v. Oates, 112 Ala. 325, 20 So. 495; Lehlbach v. Haynes, 54 N. J. L. 77, 23 Atl. 422.

Women were qualified voters.

Sec. 1, art. 7, Constitution; Ops. of Atty. Gen., 1912-13, p. 245.

Where there is a plain. speedy and adequate remedy at law, equity will not grant an injunction to prohibit the sale and negotiation of bonds.

Morgan v. Bd. of Comm'rs., etc., 39 Pac. 1118.

### OPINION OF THE COURT.

ROBERTS, C. J.—This action was instituted in the court below by appellants, Moses B. Jones, county treasurer of Roosevelt county, and school district No. 30 of said county, to enjoin said defendants from advertising for sale, negotiating, selling, or transferring certain bonds, voted by said school district, for the purpose of constructing a new schoolhouse therein, and which the

treasurer of said county, it was alleged, was proceeding to advertise and sell, under the statute. To the second amended complaint a demurrer was filed by appellees, which was sustained generally by the court, and judgment was entered for the appellee. From this judgment appellants prosecute this appeal.

Seven legal propositions were presented by the demurrer, which will be discussed here; the facts being stated in connection with the consideration of each separate point.

[**1, 2**] The third, fourth, fifth, sixth, and tenth paragraphs of the complaint, to which the first and sixth paragraphs of the demurrer were addressed, alleged, in substance, that on or about the 5th day of March, 1914, a petition purporting to have been signed by 20 residents of said district, and no more, was presented to the county superintendent of schools of said county, asking that such superintendent order the school directors of school district No. 30, said county, to hold an election for the purpose of voting on the question of the issuance of $5,000 in bonds of such district for the purpose of erecting a new schoolhouse. This allegation is followed by others, showing that, pursuant to such petition, the superintendent ordered the board of directors to submit such question to the voters of such district; that the directors, pursuant to such petition and order, did so submit such question; and that at such election bonds were voted by a majority of one vote. The complaint further shows that such district already had a school building, and alleges that two of the signers of such petition were not qualified petitioners, setting up the ground of disqualification.

Appellees contend that the directors of the school district had the power and authority to call and hold the election of their own volition, the district having a school building, and that it will be presumed that the directors acted voluntarily in the matter, notwithstanding the petition to and order of the county superintendent.

Section 1542, C. L. 1897, authorizes the school directors of any school district to submit to the voters of their district at any annual or special election, called for that

purpose, the question of the issuance of bonds for the purpose of constructing a school building. Under this section the proposition as to whether bonds shall be voted for a new building may be submitted to the voters of the district, upon the initiative of the directors, regardless of the fact that such district has or has not a school building. In 1899 the Legislature, by chapter 46, Laws of 1899, provided that the county superintendent of schools should have the power, in cases where any school district in his county does not own a schoolhouse, upon a petition signed by 20 residents of such school district, etc., to order the school directors of such district to submit the question of issuing bonds of such district for the purpose of building a schoolhouse, and gave the superintendent the right to remove directors for failure to submit such question when so ordered.

Appellees contend that chapter 46, supra, had no application to the election held in this case, it being governed by section 1542, C. L. 1897, which required no petition to or action by the county superintendent; that the complaint, failing to allege that the school directors acted against their own best judgment, or that they were coerced into calling the election by the order of the county superintendent, stated no cause of action, in this regard. The position taken by appellees is correct. There being a schoolhouse in this district, the county superintendent had no power or authority to order the directors to hold the election in question. Presumably the directors knew the law, and did not act in the premises because of the order issued by the superintendent. There existed statutory authority for the calling and holding of the election by the directors, and the statute was followed in the present case, in so far as we are advised by the complaint. The fact even that the directors thought they were acting under the act of 1899, rather than section 1542, supra, would not affect the case, if the acts done by them were legal under said section.

> "The authority and powers of officers are determined by the law, considered as a whole, and a mistaken conception on the part of an officer

as to the statute under which he has acted will
not affect the validity of his action, provided he
actually had legal authority." 29 Cyc. 1431.

In the case of Davis v. Brace, 82 Ill. 542, a county offi-
cer extended certain taxes. He thought he was acting
under one statute, whereas his power to do the act was
derived from another. The court said:

"It would seem, therefore, especially in a
court of equity, wholly unimportant under what
law the clerk intended to make the extension. It
is sufficient that there is a law which confers au-
thority to do what he has done."

In the case of In re Rockaway Park Imp. Co., 83 Hun.
(N. Y.) 263, 31 N. Y. Supp. 386, the supervisors of a
county recited a repealed statute as the source of their
authority. The repealing statute conferred upon the
board the power to do the act, which they undertook to
do under the repealed act. The court said:

"If the board thus had full power to do what
they did, their action was not rendered illegal
by a mistake in the recitation of the source of
its power."

See, also, Pope v. Davenport, 52 Tex. 206.

The above being true, the court properly sustained these
paragraphs of the demurrer.

The seventh paragraph of the complaint was as follows:

"Seventh. Plaintiffs allege: That the ma-
jority of the qualified electors of said school dis-
trict voting in said election did not vote for the
issuance of the bonds of said district in that the
following named persons, who voted for the issu-
ance of the bonds of said district at said election,
and whose votes were counted therefor, were not
qualified electors and voters at said election:
Willie Mae Culberson and Z. H. Woods. That
said Willie Mae Culberson and Z. H. Woods, or
either of them, at the time they voted at said
election as aforesaid, were not bona fide residents
of said school district, and entitled to vote at
said election. Plaintiffs allege that they are

informed and believe that Mrs. I. V. Chapman,
Mrs. Hawkins, Amanda Moran, and Fidelia
Vincent, whose true Christian names are to the
plaintiffs otherwise unknown, who voted at said
election for the issuance of said bonds, were not
qualified voters and electors at said election, in
that they were not bona fide residents of, and
did not have their domicile in, said school dis-
trict at the time they voted at said election, and
that all the above-named illegal votes were
counted at said election in favor of the issuance
of the bonds of said district."

To this paragraph of the complaint the third paragraph
of the demurrer was evidently directed, which reads as
follows:

"(3) Because the alleged disqualifications of
the alleged illegal voters are not sufficiently set
forth, so that the court may judge whether or
not such disqualifications actually exist, and for
the further reason that it is nowhere alleged that
the votes cast against the issuance of said bonds
were all legal, and consequently the court is un-
able, from the pleadings, to determine whether
or not the majority of legal votes were for or
against the proposition of issuing the bonds."

This paragraph of the demurrer presents two legal
propositions, which are: First, whether the alleged dis-
qualification of the voters was sufficiently set forth; and,
second, whether it was necessary to allege that all the
votes cast against the issuance of the bonds were cast by
legal voters.

Appellee admits that a person, to be a qualified voter at
a school election, must be a resident of the school district
at the time he offers to vote at an election held therein.
That this is true is indisputable. Such being the case, if
Willie Mae Culberson and Z. H. Woods and the other
persons named in the seventh paragraph of the complaint
were not residents of the said school district, they were
not entitled to vote therein at the election in question.
The complaint alleged that all these parties were "not

bona fide residents" of said school district and entitled
to vote at said election. As the complaint further showed
that there were 59 votes in favor of the issuance of the
bonds and 58 against said proposition, the facts alleged
clearly showed that the majority of the legal voters did
not vote in favor of such bond issue. The allegation in
question was, we believe, sufficient as against the demur-
rer. If the appellees conceived that the allegations were
not sufficiently specific, they should have filed a motion
to make the same more definite and certain. Parties are
only required to plead the ultimate facts, and residence is
a question of fact. The persons named were either resi-
dents or nonresidents of the school district. If bona fide
residents of the school district for the time required, they
were qualified voters, otherwise they were not. The plead-
ing alleged that they were not such residents, which plead-
ed an issuable fact.

The second paragraph of this ground of the demurrer
was also not well taken. The complaint, in the sixth
paragraph, alleged that the bond issue was carried by one
vote, and the disqualification of the two voters above nam-
ed, which is positively alleged, would have changed the
result of the election. When an elector is permitted to
deposit his ballot, the presumption is in favor of the le-
gality of the vote. 15 Cyc. 416. This being true, it
would be presumed that all the votes cast at this election
were cast by legal voters. The complaint alleges that cer-
tain of the votes cast in favor of the bond issue were cast
by persons not qualified to vote at such election. All votes
not so attacked by the complaint would be presumed to
have been cast by legal voters; and, this being true, the
58 votes cast against the proposition presumptively were
cast by legal voters. If they were not, it was matter
which the defense should have pleaded. A pleading need
not and should not, by its averments, anticipate a defense
thereto and negative or avoid it. 31 Cyc. 109. The com-
plaint herein, in the eleventh paragraph, alleged that the
majority of the legal votes were cast against the issuance
of the bonds, and that, if the illegal votes named in the
complaint had not been counted in favor of the issuance

of the bonds, the result would have been, etc.; and in the seventh paragraph it was alleged that the majority of the qualified electors of said school district voting at said election did not vote for the issuance of the bonds of such district. These allegations, in connection with the matters set forth in the seventh paragraph of the complaint, were all that the complainants were required to allege in this regard.

Appellees cite three cases which they claim support their contention that it was necessary for the complainants to allege that no illegal votes were cast against the issuance of such bonds. These are Wade v. Oates, 112 Ala. 325, 20 South. 495; Lehlbach v. Haynes, 54 N. J. Law, 77, 23 Atl. 422, and Hannah v. Shepherd, (Tex. Civ. App. 137) 25 S. W. 137. The first two of these were contested election cases, where the statute set forth the facts which the petitioners must allege, and the decisions were based upon the statutory requirements. They are not in point here. In the last case cited, the complaint failed to allege that the majority of the legal votes cast was against the adoption of the fence law. The defect there does not exist in the complaint in this case, for it is alleged that the majority of the legal votes were cast against the issuance of the bonds.

The eighth paragraph of the complaint proceeds upon the theory that it was necessary for a woman, in order to become a qualified voter at a school election, assuming that the election in question was such, to have paid a property tax or a poll tax in such school district or county. Under section 1532, C. L. 1897, it was provided, relative to elections for school directors, that:

"Only legal voters, residing and paying taxes in said district, shall be qualified to vote at said election."

Section 1542, which made provision for voting bonds, under which this election was held, provided for the submission of the question of issuing bonds to the voters of the district. In 1909 the Legislature, by chapter 95, Laws 1909, amended section 1532, supra, by adding to it the following paragraph:

"All legal voters, residing in a school district,
who have paid the poll tax of the current year
in said district, shall be considered qualified vot-
ers of said district, entitled to vote theirein."

The first provision quoted from the original section
1532 was undoubtedly repealed by section 20, ch. 105,
Laws 1909, which provided:

"All laws, acts and parts of acts required as
one of the qualifications of voters at any election
in this territory for any purpose that they shall
be taxpayers or that they shall have paid their
taxes, are hereby repealed."

And waiving the question, as to whether the last-quoted
provision operated to repeal chapter 95, Laws 1909, both
acts having been approved by the Governor on the same
day, it certainly cannot be argued, with any consistency,
that women, in order to be qualified to vote at a school
election, must have paid a poll tax. Under the territorial
and state law, women have never been required to pay a
poll tax. This tax is only levied on "male citizens, over
the age of twenty-one years." The state Constitution
(section 1, art. 7), after prescribing the qualifications of
those "qualified to vote at all elections for public officers,"
which right is conferred upon male citizens of the United
States, possessing the named qualifications, proceeds:

"Women possessing the qualifications prescrib-
ed in this section for male electors shall be quali-
fied electors at all school elections."

[3] It is well settled that, where the Constitution of
a state fixes the qualifications and determines who shall
be deemed qualified voters in direct, positive, and affirma-
tive terms, these qualifications cannot be added to by leg-
islative enactment. 15 Cyc. 281; Cooley's Constitutional
Limitations (7th Ed.) p. 99, note 3. This being true,
and our state Constitution prescribing the qualifications
which women voters shall have, and saying, in express
terms, that they shall have the right to vote at all school
elections when they possess the prescribed qualifications,
it would not be competent for the Legislature to add to
these requirements. This being true, the demurrer to

this paragraph of the complaint was properly sustained.

[4] The ninth paragraph of the complaint proceeds upon the theory that the election held for the purpose of voting on the question of the issuance of bonds by a school district is not a "school election," within the meaning of section 1, art. 7, of the state Constitution, which confers upon women possessing certain qualifications the right to vote at "all school elections." The portion of said section in question reads as follows:

"All school elections shall be held at different times from other elections. Women possessing the qualifications prescribed in this section for male electors shall be qualified electors at all such school elections."

Section 11, art. 9, of the state Constitution, in so far as material, reads as follows:

"No school district shall borrow money, except for the purpose of erecting and furnishing school buildings or purchasing school grounds, and in such cases only when the proposition to create the debt shall have been submitted to the qualified electors of the district, and approved by a majority of those voting thereon."

Appellant argues that the words "qualified electors," used in the last-quoted section, refer only to male electors; that, as women are only given the right of suffrage in a narrow and limited sense, it is not supposed that the framers of the Constitution would refer to them as "qualified electors," without placing any restriction upon the language used. The case of Oppegaard v. Board of County Commissioners, 120 Minn. 443, 139 N. W. 949, 43 L. R. A. (N. S.) 936, is cited in support of this contention. As we read the case, however, it is not in point. There the court was construing a statute, providing for the enlargement of a school district upon the petition of a "majority of the legal voters residing within such school district," and held that the term "legal voter" applied only to male electors, notwithstanding the Constitution gave women the right to vote at "any election held for the pur-

pose of choosing any officer of schools, * * * or upon any measure relating to schools." The court said:

> "We do not mean to say, nor do we think Mr. Justice Mitchell meant to say, that there may not be educational matters other than elections of school officers upon which women, under the Constitution, would be entitled to vote."

The petitioning for a change in boundaries of a school district is not an election, and, where no constitutional provisions govern, it would be competent for the Legislature to prescribe the qualifications requisite for a petitioner. That the holding might have been different, had the question been as to the right of women to vote at an election, is clearly shown by the following language in the opinion:

> "If the question here were upon the right of women to vote upon some school measure, under a statute providing for the submission of such matter to the 'legal voters' at an election, it might be that the case cited (referring to Hall v. Madison, 128 Wis. 132, 107 N. W. 31) would be in point to the proposition that, under our Constitution, women would have to be accorded the right to vote in order to save the statute."

The first clause quoted from our Constitution gives women the right to vote at all "school elections," who possess the prescribed qualifications. They are by the Constitution made qualified electors at all "school elections," and, for all school election purposes they are qualified electors. This being true, when the framers of the Constitution used the term "qualified electors of the district," it is only reasonable to suppose that they referred to the class of persons theretofore made qualified electors of the school district at all school elections.

That an election for the purpose of determining whether bonds of a school district shall be issued for the construction of a school house is a "school election" can hardly be doubted. Under section 1542, C. L. 1897, which had been in force for more than 20 years at the time the Constitution was adopted, an election was provided for

the purpose of determining such question. This question, under the statute, could be submitted to the voters at any annual election of school officers or at a special election called for that purpose. If the voting upon the question of the issuance of bonds is not a school election, we would be confronted with the anomalous situation that such question could not be submitted to the voters of a school district at an election held for the purpose of electing school officers, but it could be submitted at the regular biennial election for state and county officers.

The first sentence quoted above from section 1, art. 7, provides that "all school elections shall be held at different times from other elections."

Again, had the constitutional convention intended that women should only have the right to vote for officers of a school district, it would have been easy to have said so, but the broader term "all such school elections" was employed.

We fail to understand why an election for the purpose of voting on the proposition of issuing the bonds of a school district for the erection of a school building is not a "school election," within the meaning of the Constitution. Such question can only be determined by an election (section 11, art. 9, of the Constitution), and certainly the question of having suitable schoolhouses, wherein the children may receive instruction, is as intimately connected with educational affairs as the election of school directors. If the voting for school directors is a "school election," why would not the voting for the erection of a new school building, or the authorization of the same, be a school election

The members of the constitutional convention knew, as we all know, that women are vitally interested in educational matters. Every mother urges her children to study, talks with them daily about their school work, drills them in their lessons, has the opportunity to know and knows the work being done by the teachers. They also keep in daily touch with the schools and know the needs and requirements for new school buildings and additional school facilities. These facts prompted the enactment of the

provisions found in our Constitution, and the courts should be very slow to restrict or impair rights thus granted. Support for our position is found in the adjudicated cases.

In the case of Hall v. Madison, 128 Wis. 132, 107 N. W. 31, the court was called upon to decide whether an election to determine whether a city should issue bonds for the purpose of building a schoolhouse was an "election pertaining to school matters," within the meaning of chapter 211, Laws of 1885, which had the effect of a constitutional provision by reason of its submission to the voters of the state. It was provided that every woman, etc., "who has resided within the state one year, and in the election district where she offers to vote ten days next preceding any election pertaining to school matters, shall have a right to vote at such election." The court said:

"Is not the borrowing of money to build a schoolhouse an act pertaining to school matters as much as the expenditure of moneys in hand for that purpose? Suppose there were a law providing that, whenever a city proposed to build a schoolhouse or purchase a new school site costing more than a given sum, the question whether such a sum should be spent for that purpose should be submitted to vote; would not the election held under such a law be strictly an election pertaining to school matters? Would the fact that the expenditure of municipal funds was involved take from the proposition its character as an election pertaining to school matters? In fact, does not any proposition relating to the better management of the schools necessarily involve the question of the expenditure of corporate funds? And, if women are to be denied the right to vote because the expenditure or the borrowing of money is involved, does not the law become a mere husk without the kernel? These questions bring us to the broader question of the general purpose of the law. It must, of course, be assumed that it was passed to give some sub-

stantial right to women which they did not before possess. To suppose that the Legislature or the people intended, by the use of vague language or glittering generalities, to 'make a promise to the ear and break it to the hope,' or to seem to give a right which was, in fact, substantially withheld, cannot be entertained without an imputation of bad faith to both Legislature and people. If the purpose had been to limit the right to school district meetings, or to voting for school officers or employes, it would have been easy to do so by simple and appropriate language. No such purpose can, in our judgment, be spelled out either from the language of the act or its title. On the other hand, the very broad and general nature of the language used indicates clearly the intent to cover a broad field rather than a narrow one. The title of the act (chapter 211, Laws of 1885) exhibits this intent most persuasively. It is: 'An act relating to the exercise of the right of suffrage by women upon school matters.' It is not the right to vote at school district meetings (which can only be called the right of suffrage in a limited sense), or the right to vote for school officers, but the right of suffrage upon school matters, to which, the Legislature declares by the title, the act refers. Nor is this declaration of intent narrowed or limited by the wording of the act itself. The act, in terms, gives women the right to vote at any election (not at any district school meeting) 'pertaining to school matters,' and further it provides that the form of the ballots to be used by the people in voting upon the law should be 'For woman suffrage in school matters,' and 'Against woman suffrage in school matters.' These broad general words indicate the intent to give the full right or suffrage in school matters, or else they indicate an intent to deceive by apparently giving much while in fact giving little

or nothing. The latter intent cannot be entertained for a moment."

See, also, Olive v. School District, 86 Neb. 135, 125 N. W. 141, 27 L. R. A. (N. S.) 522, where the syllabus summarizes the holding of the court as follows:

"Women entitled to vote at school elections may lawfully vote for or against school district bonds."

The demurrer to this paragraph of the complaint was properly sustained.

[5, 6] Section 1545, C. L. 1897, provides, in part:

"That no bonds of any district shall be issued or any special tax levied until the boundaries of said districts shall have been established and the property marked by monuments or by natural objects as provided by law."

It is alleged in the thirteenth paragraph of the complaint that at the time of the holding of the election, and at the time the bonds in question were issued by the board of directors of said district and delivered to the county treasurer for countersigning and selling, as directed by law, that boundaries of said district were not established, and the boundaries and property marked by monuments, or by natural objects, as required by section 1545, C. L. 1897. The demurrer to this paragraph of the complaint proceeds upon the theory that the bonds were not "issued" until countersigned by the treasurer and delivered to the purchaser; consequently the complaint, not alleging that the boundaries of the district were not established and the boundaries and property marked at the time the complaint was filed, or that said treasurer was about to sell the bonds and deliver them to the purchaser before these provisions of the statute were complied with, failed to state a cause of action. In other words, it is appellees' contention that the boundaries need not be established and monumented prior to the election, or the signing of the bonds by the president of the board; that the word "issued," used in the statute, refers to final delivery of the bonds to the purchaser, and not to any of the precedent steps required by the statute.

The verb "to issue" means to emit or send forth, and it does not embrace the preliminary acts of calling and holding the election, or signing and dating the bonds, but is confined to the delivery, unless the context of the statute requires that a different meaning should be accorded to the words. Perkins County v. Graff, 114 Fed. 441, 52 C. C. A. 243; Corning v. Board of Com'rs, 102 Fed. 57, 42 C. C. A. 154.

Appellant argues that the meaning of the word "issued," in section 1545, is controlled by the language of section 1542, which, after providing for the calling and holding of the election, proceeds:

"And if a majority of all the votes cast upon that question, be in favor of the issue of such bonds, then said board shall issue bonds to the amount voted."

We cannot agree with this contention. The two sections of the statute, which evidence the object in view by the Legislature, and the purpose to be accomplished, are sections 1541 and 1547. The first section limited the amount of indebtedness which might be incurred by any school district to 4 per centum of the value of the taxable property within the district. The last section provided:

"That in any school district where a special tax is in contemplation of being levied, or of bonds being issued, and after the boundaries of the district have been properly determined and marked for that purpose, it shall be the duty of the county assessor to visit said district and make an assessment of all taxable property, both personal and real, within said school district, as fully and completely as he is now required to make the assessment of the county, and he shall be governed by the same rules, especially including in such assessment all kinds of live stock which graze wholly within the limits of such district. The county assessor shall provide each board of district directors with a copy of such lists of taxable property in the several districts."

The last section was evidently for the protection of the purchaser of bonds, so that he might know in advance just what the assessed value of the property in the district was, and thereby refuse to purchase the bonds in case the issue, added to the outstanding indebtedness, exceeded the limitations fixed by section 1541. Again the purpose in having the boundaries of the district monumented was twofold: First, to settle definitely and beyond dispute the property upon which the bonds would become a lien; and, second, to enable the county assessor to ascertain just what property was within the district, and assess the same. This being true, the time of establishing and marking the boundaries of the district would be immaterial, so long as the acts were done prior to the sale of the bonds by the county treasurer. Had the Legislature intended that such acts should precede the election, it would have been an easy matter to have said so.

Presumably the boundaries of every school district are known. We do not understand that the law gives to the county surveyor the right to arbitrarily establish the boundaries of such district. In running the lines and monumenting the boundaries, he would be governed by the theretofore known boundaries of the same. All that he could do, under the section quoted, would be to mark on the ground and record in field notes the boundaries of such districts. He has no authority to add to or subtract any land from said district. He simply ascertains, as stated, the boundaries, and marks and records the same. This being true, this ground of the demurrer was well taken.

[7] The ninth ground of the demurrer was directed to the verification of the complaint. The insufficiency of the affidavit or verification to a pleading is not ground for demurrer. 31 Cyc. 285; 39 Century Digest, tit. "Pleadings," § 423.

[8] The tenth ground of the demurrer raises the question as to whether plaintiffs had an adequate remedy at law by contest, under the statute. It is only necessary to say that our statutes contain no provision for contesting such an election as the one now under consideration.

The second ground of the demurrer challenged the sufficiency of the complaint to state a cause of action. The seventh paragraph of the complaint alleging facts, which, if true, invalidated the election, this ground of demurrer was not well taken.

The cause will be reversed and remanded, with directions to the district court to overrule second, third, ninth, and tenth grounds of demurrer, and to proceed in accordance with this opinion; and it is so ordered.

HANNA and PARKER, J.J., concur.